Argued and submitted July 24, affirmed December 11, 1996, petition for review denied May 20, 1997 (325 Or 368)

# STATE OF OREGON,
*Respondent,*

*v.*

# DION ANTHONY AUSTIN,
*Appellant.*

## (C94-05-32970; CA A86162)

929 P2d 1022

Eric M. Cumfer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Paula Johnson Lawrence, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant appeals from a judgment of conviction for possession of a controlled substance, ORS 475.992(3), after a court trial on stipulated facts. He argues that the trial court erred in denying his motion to suppress evidence that was obtained at the time of his arrest. We affirm.

On the evening of April 14, 1994, Portland police officer Stradley was patrolling an area of northeast Portland in a marked police car. As Stradley approached the intersection of Northeast 8th Street and Roselawn Street, where he knew narcotics transactions frequently occurred, three people "took off running" as soon as they saw his car. About an hour-and-a-half later, around 10:00 p.m., Stradley again approached the same intersection from a different direction so that he would not be seen so quickly. As he did so, he saw a group of 10-12 adolescent young men, including defendant, standing on the corner "huddled around talking." When the youths saw Stradley's patrol car, they "started to kind of break apart." Stradley then stopped his car across the street from the youths, got out, and, standing between the driver's side door and the car, called out, "Hey, let me see your hands, let me see you guys' hands." Stradley did so "to see everybody's hands for my safety and to see what kind of reaction I would get."

The youths, including defendant, showed their hands. Because "it didn't appear that there was going to be any kind of immediate danger," Stradley approached the group. As he did so, defendant, who was "extremely nervous," told Stradley that he had a BB gun in his pocket. Based on his "training and actual experience," Stradley had reason to believe that a person who says that he or she has a BB gun often has a "real gun" instead. Consequently, Stradley drew his service revolver from its holster, ordered defendant and the other youths down on the ground, and called for a backup. Stradley then approached defendant, who was lying on the ground, and took the gun—which was, in fact, a loaded BB gun "shaped similar to a semi-automatic handgun"—from defendant's back pocket. After Stradley took the BB gun, defendant reached into his pocket and pulled out a pager. As

he did so, some marijuana "came out along with the pager," and fell to the ground. The total amount of the marijuana was less than one ounce.

Stradley arrested defendant for carrying a loaded firearm, in violation of Portland City Code Section (PCC) 14.32.010(c).[1] By that time, a second officer, Knudson, had arrived as a backup. Stradley told Knudson about the BB gun, marijuana, and pager and asked Knudson to finish patting down defendant and to place him in the patrol car. Knudson read defendant his *Miranda* rights and, before placing him in the patrol car, searched defendant for "weapons, items of escape, spare keys, handcuffs, things like this, narcotics." As Knudson patted the outside of defendant's pocket, defendant said, "It's not mine, whatever you find, it's not mine." At that point, Knudson noticed that there was "kind of a rocky-type bulge" in defendant's pocket. Knudson reached into the pocket and pulled out a small plastic bag containing five rocks of crack cocaine. Defendant thereafter made certain inculpatory statements.

The state subsequently charged defendant with possession of a controlled substance. Defendant moved to suppress the crack cocaine and his statements to the police, arguing that that evidence was the product of "an illegal stop, search, and seizure of [defendant] * * * without reasonable suspicion, without probable cause, without knowing and voluntary consent by [defendant], and without a warrant." The trial court denied that motion, concluding that Stradley's initial conduct with respect to the group of youths, including defendant, did not constitute an illegal seizure and that Knudson's search of defendant was a valid search. In so holding, the court rendered the following conclusions of law:

---

[1] Portland City Code Section (PCC) 14.32.010(c) makes it a crime for "any person on a public street or in a public place to carry a firearm upon his person, or in a vehicle under his control or in which he is an occupant, unless all ammunition has been removed from the chamber and from the cylinder, clip, or magazine." PCC 14.32.010(a) defines "firearm" as "a pistol, revolver, gun, rifle, or other ordnance, including a miniature weapon, which projects a missile or shot by force of gunpowder or any other explosive, by spring or by *compressed air*." (Emphasis supplied.) Defendant does not dispute that a BB gun is a "firearm," as defined by PCC 14.32.010(a).

"1. That the request for a show of hands did not make this a stop, it remained mere conversation.

"2. That it may be a legal fiction that *anyone* feels free to walk away from a police officer who is attempting to engage them in any kind of conversation.

"3. That this may particularly be a legal fiction in the minority community which for a variety of reasons may experience a higher level of police activity and possibly a higher level of certain types of criminal activity.

"4. The search did not exceed legal bounds. The officer was entitled to search for instrumentalities of the crime which could include anything as small as BB's, was entitled to search for officer's safety for weapons and implements of escape, and was entitled to search for additional narcotics. The defendant's statements as the officer reached his watch pocket added probable cause to search for further contraband."

■　　On appeal, defendant first assigns error to that aspect of the trial court's denial that concluded that the officer's "request" for a show of hands did not constitute an illegal seizure under Article I, section 9, of the Oregon Constitution or under the Fourth Amendment to the United States Constitution. Invoking *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), and particularly cases in which police officers directed the physical movements of suspects,[2] defendant asserts that Stradley's "request," "Hey, let me see your hands, let me see you guys' hands," effected a substantial

---

[2] *See, e.g., City of Portland v. Price*, 106 Or App 455, 808 P2d 726, *rev den* 311 Or 432 (1991) (noting that the state did not dispute the trial court's finding that defendant was "stopped" where police approached defendant, who was sitting in a restaurant, and asked him to place his hands on the table); *State v. Johnson*, 105 Or App 587, 590, 805 P2d 747 (1991) (where officer asked defendant, who was standing behind a bush, what he had in his pockets and asked defendant to come out from behind the bush, interaction between officer and defendant exceeded "mere conversation" and constituted a stop: "Under the circumstances, a reasonable person in defendant's position would conclude that he was being summoned by the officers and was not free to continue walking back to the apartment."). *Compare State v. Tetro*, 98 Or App 492, 494-95, 779 P2d 1080 (1989) (where officer asked passenger in a parked car what was in his pockets, and defendant replied, " 'Nothing,' * * * 'Go ahead and look if you want[,]' " officer's ensuing request that passenger step out of the car so that he could look in the passenger's pockets, did not constitute a stop, "because it resulted from the passenger's express consent, rather than from a show of authority by the officer").

restraint of defendant's liberty and, thus, effected a stop that was not supported by reasonable suspicion:

> "Stradley's words * * * spoken to a group of young men at night after Stradley, in uniform and carrying a pistol, unexpectedly pulled up to the group amounted to an implicit show of authority that a reasonable person would take to mean they were not free to walk away. The request was not something done in ordinary discourse; a civilian saying that they want to see another's hands in a like situation would no doubt be offensive as implying the other person may attack them.
>
> "* * * * *
>
> "Any reasonable person facing these circumstances would feel compelled to stay. Although Stradley had not yet actually pulled out the pistol strapped on his belt, the indication he was concerned with weapons inevitably leads one to believe that a weapon would be drawn if the officer's wish is not followed, especially given that he was approaching a large group of people on his own and doing so in an area known for narcotics dealing."

The issue defendant raises is provocative and important. Nevertheless, and without implying any view as to the lawfulness of Stradley's conduct in his initial contact with the group of youths, we do not reach that question. We do not do so because, even if we were to assume that Stradley's "request"[3] effected an unlawful seizure, the evidence defendant seeks to suppress was not the product of any exploitation of that alleged prior unlawful conduct. *See State v. Rodriguez*, 317 Or 27, 38-41, 854 P2d 399 (1993) (addressing "exploitation" test); *State v. Stanley*, 139 Or App 526, 912 P2d 948, *rev allowed* 323 Or 690 (1996) (amplifying "exploitation" inquiry). Rather, as explained below, the evidence defendant

---

[3] In both its findings of fact and its conclusions of law, the trial court characterized Stradley's words as a "request," rather than as an "order" or "command." That characterization accorded with Stradley's testimony that he did not "bark out an order" but, instead, "I just asked." It appears that the characterization of words as a "request," as opposed to an "order" involves both factual and legal issues—that is, in the totality of the circumstances, would an objectively reasonable person have understood an officer's statement to "[convey] a message that compliance was required"? *State v. Dahl*, 323 Or 199, 207, 915 P2d 979 (1996). *See id.* ("The police order to defendant was not a request. * * * The order was intended to and did result in a significant restriction of defendant's liberty or freedom of movement.").

seeks to suppress flowed directly from defendant's voluntary statement that he had a BB gun.

To recapitulate briefly: After Stradley asked the youths to show him their hands, and as he approached the group, defendant told Stradley that he had a BB gun in his pocket. Defendant does not argue that his statement was either involuntary or the product of impermissible "exploitation" of Stradley's prior conduct. Once defendant stated that he had the BB gun, that, in turn, led to: (1) Stradley's frisk of defendant; (2) the consequent seizure of the BB gun and the discovery of the marijuana and the pager; (3) defendant's arrest, which was based on probable cause that defendant was carrying a loaded firearm on a public street in violation of PCC 14.32.010(c); and (4) the ensuing search incident to arrest, which resulted in the discovery of the crack cocaine and generated defendant's inculpatory statements.

■ Defendant argues, nevertheless, that, regardless of his statement that he had a BB gun, Stradley's conduct on hearing that statement—*i.e.*, drawing his service revolver and ordering all the youths down on the ground—exceeded the scope of reasonable officer safety measures permitted under ORS 131.625.[4] Invoking *State v. Johnson*, 120 Or App 151, 851 P2d 1160, *rev den* 318 Or 26 (1993), defendant asserts that Stradley's conduct effected an arrest and that that arrest was not supported by probable cause. Thus, defendant reasons that everything that occurred after the alleged unlawful arrest flowed from that illegality. Consequently, the subsequently discovered evidence must be suppressed as the product of impermissible exploitation of the unlawful arrest.

The state responds that the premise of defendant's argument—that Stradley's conduct in drawing his revolver

---

[4] ORS 131.625 provides:

"(1) A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present.

"(2) If, in the course of the frisk, the peace officer feels an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of the weapon."

and ordering everyone to the ground effected an arrest—is incorrect. Instead, the state asserts that Stradley's conduct was reasonably undertaken in the course of an officer safety frisk, ORS 131.625. That is, given defendant's statement that he had a BB gun, Stradley's conduct was fully warranted as being grounded in "a reasonable suspicion, based upon specific and articulable facts, that [defendant] might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

We agree with the state that Stradley's conduct *with respect to defendant* was justified by reasonable officer safety concerns and did not effect an arrest. In so holding, we do not imply any view as to the propriety or lawfulness of Stradley's conduct with respect to the other youths.

*Bates* admonishes:

"[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations." *Id.* at 524.

*Bates* is not, however, a carte blanche. "[W]e must draw the line at some point," *id.* at 527, as, indeed, the court did in *Bates* itself. Nonetheless, wherever that line is properly drawn, Stradley's conduct with respect to defendant did not cross it.

In particular, at the time that Stradley drew his revolver, he knew that defendant had said that he had a BB gun. Stradley drew his gun

"because training and experience and actual experience of somebody telling me they have a BB gun and it not being a BB gun, it being a real gun, I felt a real need to control the scene a little bit more seriously."

Stradley was alone, without a backup. He had an objectively reasonable basis, from his training and experience, to believe that defendant might very well have a "real gun." Given

those circumstances, we will not second-guess Stradley's judgment that, to insure his own safety, he needed to draw his weapon and order defendant to the ground before he frisked him.

Defendant's reliance on *Johnson* is misplaced. In *Johnson*, we considered whether an officer's conduct in handcuffing the defendant because of officer safety concerns effected an arrest. There, the defendant was in a motel room with another person, whom the police arrested on an outstanding warrant. As the officer arrested and handcuffed the companion, he noticed that the defendant, who was lying on top of a bed, had one hand under a pillow. The officer asked the defendant to take his hand from under the pillow, and the defendant complied. The officer asked the defendant his name and, when the defendant responded, the officer recalled that the defendant had previously been arrested for weapons charges. At that point, and without any further questioning and without attempting an officer safety frisk, the officer handcuffed the defendant.

We held that, in those circumstances, the handcuffing effected an arrest:

"There may be circumstances in which the interests of officer safety could justify handcuffing a dangerous person who refuses to submit to a frisk during a lawful stop. But when an officer fails to follow the procedure outlined in ORS 131.625, and there is no reason to believe that attempting to do so would be futile, then the use of handcuffs exceeds the restraint permitted by the statute. [The officer's] decision to skip the frisk procedure and to immediately handcuff [the defendant] instead, constituted an unreasonable seizure." *Johnson*, 120 Or App at 158.

In so holding, we emphasized that the defendant had cooperated fully with the officer and that the officer had acknowledged that, "the atmosphere was relaxed, '[a]s much as it could be for people that are being taken into custody.' " *Id.*

The circumstances here differ materially from those in *Johnson*. Here, unlike in *Johnson*, where the encounter was "relaxed," defendant was "extremely nervous." Here, unlike in *Johnson* where the officer had no direct evidence that the defendant was armed, Stradley knew that defendant

did, in fact possess a firearm within the meaning of PCC 14.32.010(a) and had a reasonable basis for believing that that weapon was a "real gun." Here, unlike in *Johnson* where three officers were present, Stradley was alone. We thus conclude that *Johnson* is materially distinguishable and that Stradley's conduct did not effect an unlawful arrest in violation of Article I, section 9, or the Fourth Amendment.[5]

■ Finally, defendant argues that the trial court should have suppressed the evidence of the crack cocaine and defendant's consequent inculpatory statements, because Knudson's search exceeded the permissible scope of a search incident to arrest for possession of a loaded BB gun in violation of PCC 14.32.010. The trial court found:

> "The search did not exceed legal bounds. The officer was entitled to search for instrumentalities of the crime which could include anything as small as BB's, was entitled to search for officer's safety for weapons and implements of escape, and was entitled to search for additional narcotics. The defendant's statements as the officer reached his watch pocket added probable cause to search for further contraband."

Defendant asserts that, even assuming that he was properly arrested for carrying a loaded BB gun, Knudson was limited to searching for weapons, means of escape, or evidence pertaining to carrying a loaded BB gun and that Knudson did not testify that he believed that the "rocky bulge" in defendant's pocket fell into any of those categories. *See, e.g., State v. Ching*, 107 Or App 631, 634, 813 P2d 1081 (1991) (where there was probable cause to arrest defendant on a bench warrant for failure to appear on a "no angling license" citation, pat down for weapons as part of lawful search incident to arrest would not have resulted in detection of baggies containing methamphetamine).

The state counters that defendant "ignores * * * the fact that the officer had previously discovered marijuana on

---

[5] In *Terry v. Ohio*, 392 US 1, 22, 88 S Ct 1868, 20 L Ed 2d 889 (1968), the court held that an officer safety frisk does not violate the Fourth Amendment if "the facts available to the officer at the moment of the seizure or the search [would lead] 'a [person] of reasonable caution' [to believe] that the action taken was appropriate[.]"

defendant[.]" Specifically, the state reasons, because the officer found some marijuana, albeit not enough to constitute a crime, the officer had probable cause to search for more marijuana and drug paraphernalia. The state points to our holding in *State v. Cromwell*, 109 Or App 654, 820 P2d 888 (1991), as support for that proposition.

In *Cromwell*, the officers, while investigating a report of a prowler, approached a truck parked in the area where the prowler had last been seen. The defendant was seated in the truck, and one of the officers, who noticed a jacket on the seat next to the defendant, asked the defendant what was underneath the jacket. The defendant lifted the jacket, revealing a small container, which the defendant admitted contained marijuana. The officer asked the defendant if he had any more marijuana, and the defendant produced a bag of marijuana. The total amount of marijuana was less than an ounce. The officers then searched the truck and found methamphetamine. We concluded that the warrantless search of the truck was valid as an automobile search, because the officers had probable cause to believe that the automobile contained marijuana:

> "The lack of probable cause to arrest defendant for a crime does not mean that the officers lacked probable cause to believe that defendant's truck contained more marijuana.
>
> " 'Although possession of less than one ounce of marijuana does not itself create probable cause to search for more, it is still relevant in determining whether probable cause exists. Other facts * * * may unite with the possession to produce the necessary level of probability.' *State v. Tallman*, 76 Or App 715, 721, 712 P2d 116 (1985).
>
> "Defendant voluntarily revealed marijuana that was located in separate containers under his jacket on the seat and in his shirt pocket. The fact that the marijuana was located in two different locations is an additional fact, when combined with admitted possession, to provide probable cause to believe that other caches of marijuana would be found elsewhere in the truck." *Cromwell*, 109 Or App at 658.

The state asserts that, at the time Knudson searched defendant, the officers knew that defendant had been "huddled"

with a group of about 10 others "where there had been a high level of street level dealing"; that defendant was carrying a small quantity of marijuana; and that he was also carrying a pager and a weapon. The state contends, by reference to *Cromwell*, that that evidence was sufficient to give Knudson probable cause to search defendant for narcotics. We agree. The trial court did not err in denying defendant's motion to suppress.

Affirmed.