Argued and submitted April 25, affirmed October 15, petition for review denied December 16, 1997 (326 Or 234)

## STATE OF OREGON,
*Respondent,*

*v.*

## GORDON PHILIP RICKARD,
*Appellant.*

(95-03-32288; CA A91303)

947 P2d 215

Sally L. Avera, Public Defender, argued the cause and filed the brief for appellant.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Eleanor E. Wallace, Assistant Attorney General.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

Haselton, J., dissenting.

## DE MUNIZ, J.

Defendant appeals from a conviction for possession of a controlled substance. ORS 475.992. He argues that the trial court erred in failing to suppress certain evidence that he contends was obtained pursuant to an illegal search. We affirm.

On the evening of March 26, 1995, Portland Police Officer Johnson was on routine patrol driving north on 82nd Avenue in Portland. She stopped at a red light behind two other cars, a Datsun that was immediately in front of her and a pickup truck that was in front of the Datsun. The occupants of the pickup jumped out of that vehicle and started yelling excitedly toward Johnson, "He's got a gun, a gun, a gun," pointing at the Datsun. Johnson radioed for assistance, turned on her overhead lights, drew her gun and aimed it at the occupants of the Datsun, and ordered the occupants of the pickup to park the pickup around the corner, out of the line of any possible gunfire. The driver of the pickup obeyed the officer's order, and Johnson remained positioned with her gun aimed at the Datsun until her backup arrived.

Several police cars arrived, and the officers initiated a "high-risk" stop. Officer Coorpender, who was in the second car to arrive, testified as to the sequence of a high-risk stop:

"Q  [By prosecutor:] Take us a little bit more specifically through this high risk stop and removing the occupants from the vehicle. Did you have your weapons drawn?

"A  Yes, we did.

"Q  And were they ordered out one at a time?

"A  Yes, they were.

"Q  Okay. Take us through —

"A  Yeah. It's a sequence —

"Q  —the stop.

"A  —for officer safety. The people in the car—and the suspects' safety, and public safety. And since there's potentially a weapon involved, we're going to assume that there's a weapon in there and it could potentially be used against someone.

"So we keep everyone at gun point, we give very explicit instructions, taking people out of the car one at a time. We usually tell them if they do not follow our instructions they may be shot, just to communicate to the seriousness of the situation.

"This is * * * a very high risk situation. There is a restaurant immediately behind where we were. People kept coming out to look at it. This is * * * a very busy street. So we had cars blocking traffic * * *. But, still, it's impossible to move—remove citizens from potential gunfire in this situation.

"So we take each person out, always bringing them out on a side where we have the maximum visibility. The two lead cars always stay on the car, with their guns pointed at the car. And even when we think we've got all the people out of the car—because we don't know that somebody might not be leaning down where we can't see them.

"And then we have—we wait until we get enough officers there that we have what's called a custody team and as the person is directed out of the car by the PA system, they reach a certain point and the custody team begins issuing commands, taking them out, handcuffing them, checking them to see if they have the weapon, and then secure them in a police car.

"* * * * *

"Q  And why were you doing that, sir?

"A  Just for officer safety. Because the primary focus of the officers at the scene was going to be on the car once we got the people handcuffed. We want to make sure they didn't have any weapons or articles of escape because they're going to be, more or less, behind us during the rest of this high-risk stop. Even though they're handcuffed in a police car, they're still (inaudible) which makes us concerned. So we want to take items out of their pockets and get them away from them.

"And as is typical in that kind of situation, we're not paying attention to what's coming out. We're just taking items out of pockets so that we know that there's nothing in there, or we don't believe there's anything in there that can harm us or allow them to escape."

The officers did not find a gun. However, one of the Datsun's occupants admitted that he had used a wrench and held it in such a way that a person could reasonably believe that the wrench was a gun. At some point during the stop, the occupants of the pickup left, without giving their names.

When the police concluded that there was no gun, they removed the handcuffs from everyone and moved the occupants and the Datsun to a high school parking lot so that they could return all of the items that they had taken from each person's pockets. Coorpender placed the items on the hood of one of the police cars and began returning the items. Among the items taken were a small baggie of marijuana[1] and a marijuana pipe. Referring to those items, Coorpender asked, "Whose is this?" Defendant answered that the items were his. Coorpender continued to return the remaining items to the four occupants and eventually came to a cloth drawstring bag. When Coorpender asked who claimed the bag, defendant replied that it was his. Coorpender then asked defendant what was inside the bag, and defendant replied that it contained "more baggies." Because the bag was not tied completely shut, Coorpender peered into it and saw a bill rolled into what he recognized from his prior training and experience as a "snort tube" used for ingesting controlled substances through one's nasal passages. He opened the bag more and found small baggies containing white powder residue, which he believed to be the residue of an illegal controlled substance. Defendant was placed under arrest and was eventually charged with possession of methamphetamine. ORS 475.992(4).

Defendant moved to suppress the evidence found in his drawstring bag. He argued that the officers exceeded the authority given to them, under ORS 131.615 and ORS 131.625, to stop and frisk him for a weapon, and that they violated his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution when they stopped him and searched his pockets. The trial court concluded that the stop was based on

---

[1] Coorpender testified that the baggie of marijuana appeared to contain less than an ounce, and therefore no crime had been committed. Although Coorpender could have cited defendant for a violation, he chose not to do so.

reasonable suspicion and that the subsequent search of defendant's pockets was reasonable under both Article I, section 9, and the Fourth Amendment. It therefore denied the motion to suppress. Defendant was thereafter tried on stipulated facts and convicted.

On appeal, defendant assigns error to the court's ruling on his motion to suppress and argues again that the officers' actions violated ORS 131.615 and ORS 131.625, as well as his rights under Article I, section 9, and the Fourth Amendment. We begin with defendant's threshold argument that the stop of the Datsun was unlawful. Defendant argues that the statements and actions of the pickup's occupants were not sufficient to provide Johnson with reasonable suspicion to believe that there was a gun in the Datsun. Defendant argues, moreover, that even if Johnson reasonably suspected that someone had a gun, "a weapon in an automobile is not necessarily criminal conduct."

ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

ORS 131.605(4) provides:

" 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts[.]"

In this case, Johnson believed that someone in the Datsun had brandished a gun at the pickup's occupants and further believed that at least one of the Datsun's occupants continued to present a threat. *See* ORS 163.190(1) ("A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of

imminent serious physical injury."). That belief was based on the words, actions, and demeanor of several unidentified citizen informants. In determining whether the informants' statements were sufficiently reliable to give rise to reasonable suspicion, we consider three factors:

> "One is whether the informant is exposed to possible criminal and civil prosecution if the report is false. That factor is satisfied if the informant gives his or her name to law enforcement authorities or if the informant delivers the information to the officer in person. The second factor is whether the report is based on the personal observations of the informant. An officer may infer that the information is based on the informant's personal observation if the information contains sufficient detail that
>
> > " 'it is apparent that the informant had not been fabricating [the] report out of whole cloth * * * [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reliable way * * *.' *Spinelli v. United States*, 393 US 410, 417-18, 89 S Ct 584, 21 L Ed 2d 637 (1969).
>
> "The final factor is whether the officer's own observations corroborated the informant's information. The officer may corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and location substantially as described by the informant." *State v. Villegas-Varela*, 132 Or App 112, 115, 887 P2d 809 (1994) (citations omitted; brackets in original).

■    Applying that test, we conclude that, in the totality of the circumstances, the informants' statements, coupled with Johnson's observations, gave rise to a reasonable suspicion that someone in the Datsun had displayed a gun. First, the occupants of the pickup exposed themselves to possible criminal and civil prosecution by conveying the information to Johnson in person. Although the occupants eventually left the scene, there is no indication that they left because they were unwilling to give their names or that they had any motive to lie. Moreover, the occupants' apparently spontaneous and agitated actions and demeanor were fully consistent with having just seen a firearm brandished on a busy street. Johnson's personal observations in that regard materially corroborated the informants' statements. Thus, Johnson had

a reasonable suspicion not only that someone in the Datsun had a gun, but also that it had been shown in such a way as to violate ORS 163.190. The circumstances presented a continuing threat to Johnson and to other motorists and pedestrians at a busy intersection.

Defendant next argues that, regardless of whether the officers reasonably suspected that there was a gun in the Datsun, their search of defendant was unreasonable under the circumstances. He argues that the officers should have limited their search to a pat down of each occupant's outer clothing instead of a full search of each occupant's pockets. The state counters that the officers' conduct was warranted by officer safety concerns, given Johnson's reasonable belief that someone in the Datsun was armed, and given the potentially volatile circumstances, *e.g.*, a stop at night at a busy intersection. Thus, as described by Coorpender, the officers felt justified in removing *all* objects from the occupants' pockets, regardless of whether those objects could possibly be weapons, because of the "high-risk" situation.

Defendant contends that that conduct was unlawful in that it exceeded the scope of ORS 131.625. That statute provides:

> "(1)   A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present.
>
> "(2)   If, in the course of the frisk, the peace officer feels an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of the weapon."

ORS 131.605(2) defines a "frisk" as "an external patting of a person's outer clothing." Thus, once an officer reasonably suspects that a person is armed and dangerous, the statute permits an officer to initially pat-down the person's external clothing for a weapon, and, if, in the course of that pat-down the officer finds what he or she reasonably suspects is a weapon, the officer may pull out the weapon.

■ We agree with defendant that the officers' conduct exceeded that described in ORS 131.605(2). Rather than engaging in a preliminary pat-down and then taking possession of objects so detected, they immediately pulled everything out of defendant's and the other Datsun occupants' pockets.

■ The fact that the officers did not follow the statutory procedure is not, however, conclusive. We have never held that the frisk procedures of ORS 131.625 define the outer limits of permissible officer safety measures in the context of a stop. Indeed, we have implicitly concluded otherwise. *See, e.g., State v. Austin*, 145 Or App 217, 223-26, 929 P2d 1022 (1996), *rev den* 325 Or 368 (1997) (where the defendant indicated that he had a BB gun, officer's action of drawing his service revolver and ordering him to the ground did not violate ORS 131.625); *State v. Johnson*, 120 Or App 151, 158, 851 P2d 1160 (1992), *rev den* 318 Or 26 (1993) (indicating that there are some circumstances in which officers, for safety purposes, may bypass the statutory procedures set forth in ORS 131.625). *Cf. State v. Lumpkin*, 129 Or App 601, 606, 880 P2d 468, *rev den* 320 Or 315 (1994) ("reasonableness in all circumstances" is the key inquiry under ORS 131.625), *on remand* 133 Or App 265, 891 P2d 660, *rev den* 321 Or 138 (1995). Rather, officer safety measures in the context of a stop are circumscribed by principles of reasonableness broadly announced in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). *See also Austin*, 145 Or App at 224-25.

■ In *Bates*, the court held that Article I, section 9,

"does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." 304 Or at 524.

The court further explained that an officer "must be allowed considerable latitude to take safety precautions in such situations." *Id.* "*Bates*, is not, however, a carte blanche." *Austin*, 145 Or App at 224. The precautions must be reasonable "under the circumstances as they reasonably appeared at the

time that the decision was made." *Bates*, 304 Or at 525. Thus, "reasonableness" under *Bates* necessarily requires consideration both of the nature and extent of the perceived danger and of the degree of intrusion or restraint resulting from the officer's conduct, keeping in mind that we are not to "uncharitably second-guess" the split-second decisions of officers working under dangerous, potentially deadly, circumstances. *Id.* at 524.

■     The officers' testimony shows that the circumstances here—a night-time stop at a crowded, busy intersection of an automobile with several occupants who were possibly armed—presented just such dangerous, potentially deadly circumstances that call for considerable latitude in the officers' response. The dissent, however, concludes that the officers' removing everything from the occupants' pockets without engaging in a frisk was unreasonable because, although the "initial danger was very great * * * by the time the indiscriminate emptying of pockets occurred, that danger had been substantially mitigated by virtue of the presence of multiple officers with drawn weapons and the handcuffing." 150 Or App at 528-29.

In the first instance, even assuming that the presence of weapon-displaying officers mitigates the danger to the extent the dissent claims, the dissent does not explain why a "substantial mitigation" of a risk of danger meets concerns for safety. We know of no authority that suggests that, if a risk of danger is "substantially mitigated," officers are precluded from trying to completely eliminate any risk. Additionally, the dissent arrives at its conclusion by focusing on three factors: that there were multiple officers with drawn guns, that each occupant was handcuffed before pockets were checked, and that the "primary, albeit not necessarily exclusive," object of concern was a firearm, which could be detected by a pat-down. 150 Or App at 528. The dissent treats these factors as discrete, thereby dissolving the totality of the circumstances and ignoring the continuing possibility of danger until the stop was completed. The dissent's view fails to acknowledge that the officers were confronted with a situation involving weapons and an unknown number of persons in a crowded public area.

When the stop is viewed in its entirety, as it must be, it is apparent that the dissent errs in assuming that handcuffing the occupants and frisking for a gun sufficiently met all concerns for safety in those circumstances. When Johnson called for assistance, all she knew was that someone had yelled to her that an occupant of a mobile car in front of her had pointed a gun. Neither she nor the officers who assisted her knew whether there was, in fact, a gun or which of the several occupants in the car had it. Indeed, the officers did not know if there were occupants in the car who were not visible.

In other words, as the dissent acknowledges, the potential for danger was great. The location of the stop exacerbated that potential. The stop occurred at night at a busy intersection in front of a restaurant. Police cars were blocking the intersection. People came to look, and the officers could not remove them from the area of danger. Even though the occupants would be handcuffed and placed in a police car, safety concerns were not over until the car had been searched, and Coorpender testified that officers remained concerned. Handcuffing did not remove all possibility of danger or escape if items were left in pockets of the occupants when the circumstances included that the occupants were a group, unknown occupants might remain in the car, and there was no evidence that an officer guarded the occupants in the patrol car.

In short, the need for *all* possible safety precautions was paramount, and the surroundings of the stop demanded a quick response. The procedure the officers followed minimized the risk of danger to the officers and to the public and did so as quickly as possible. The dissent errs in second-guessing the officers' response under these circumstances. The discovery of the narcotics did not flow from an illegal search, and the trial court did not err in denying the motion to suppress.

Affirmed.

**HASELTON, J.,** dissenting.

I agree with every aspect of the majority's analysis except the last: The officers' indiscriminate emptying of

defendant's pockets after he had been handcuffed, and while he and other suspects were being held at gunpoint, cannot be justified under *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). Accordingly, I respectfully dissent.

Like my colleagues, I recognize that the circumstances here were highly dangerous, at least initially. And, like my colleagues, I am mindful of *Bates'* admonition not to "uncharitably second-guess" the split-second decisions of officers working under dangerous, potentially deadly, circumstances. *Bates*, 304 Or at 524. I have no illusions—recent events permit us none—that it is far easier, and safer, to write opinions in cases like this than to apply them on the street, night and day.

Nevertheless, in our constitutional system, there are, and must be, limits. This case exceeds those limits. When viewed in the totality of the circumstances, the officers' conduct here, in removing everything from the occupants' pockets without engaging in a frisk, exceeded even the benign "considerable latitude" that *Bates* allows. *Id.*

That conclusion derives from a combination of three factors. First, by the time the officers began removing everything from the Datsun's occupants' pockets, several police officers were at the scene, all with guns drawn. Second, each occupant was handcuffed before the officers checked his or her pockets. Third, the primary, albeit not necessarily exclusive, object of officer safety concerns was a firearm, which, if secreted in a pocket, could, presumably, be detected by a patdown. There is no suggestion that a frisk would have been ineffective or inadequate.

As the majority acknowledges, *Bates* contemplates consideration *both* of the nature and magnitude of the perceived threat *and* of the degree of intrusion, which Article I, section 9, would ordinarily preclude. The validity of any given measure must be assessed in the light of the circumstances *at the time that measure is undertaken*.

Here, the initial danger was very great. It was precisely because of that danger that the officers' conduct in ordering the occupants out of the Datsun at gunpoint and then handcuffing them was reasonable and permissible.

However, by the time the indiscriminate emptying of pockets occurred, that danger had been substantially mitigated by virtue of the presence of multiple officers with drawn weapons and the handcuffing. Moreover, as noted, there was no explanation in this record as to why a pat-down would not have reasonably addressed the officer safety concerns as so mitigated. Finally, the degree of intrusion—the involuntary and indiscriminate removal of all objects from a physically restrained person's clothing—was very great.

Despite those factors, the majority concludes that the officers were, nevertheless, entitled to "completely eliminate any risk," 150 Or App at 526, and to undertake "*all* possible safety precautions." 150 Or App at 527 (emphasis in original). The majority gives no authority for that absolutist approach—which, given that safety is never certain, could just as easily justify a strip search. Indeed, such a categorical approach cannot be reconciled with the dictates of reasonableness, which, the majority itself acknowledges, constitutionally circumscribe permissible officer safety measures. *See* 150 Or App at 525-26. In the end, neither the state nor the majority can explain why a simple frisk would not have been reasonable and adequate *in these circumstances.*[1]

It was incumbent upon the state, as the proponent of the warrantless search so effected, to demonstrate why, given officer safety concerns as mitigated at the time of the search, the wholesale indiscriminate intrusion was reasonably warranted. *See generally Bates*. It failed to do so. Accordingly, the emptying of defendant's pockets constituted an illegal search under Article I, section 9. *See State v. Johnson*, 120 Or App 151, 158, 851 P2d 1160, *rev den* 318 Or 26 (1993) (where there was no reason to believe that attempting to follow the statutory procedure would be futile, officers' decision to skip the frisk procedure in ORS 131.625 and to immediately handcuff the defendant constituted an unreasonable seizure).

---

[1] I do not, of course, suggest that the wholesale emptying of a suspect's pockets can never be justified as an officer safety measure. One obvious scenario could involve a single officer encountering dangerous suspects, without backup. In such a situation, if officer safety concerns were sufficiently great, it might well be reasonable for the officer to order the suspects to empty their pockets.

Finally, suppression is required because the discovery of the narcotics in the drawstring bag flowed from the illegal search. The state suggests that there was no "exploitation," because the causal link between any illegality and the discovery of the drugs was nothing more than the sort of "but for"-ness disavowed in *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993). I disagree. The link between the illegal conduct and the evidence sought to be suppressed was direct: The conduct itself literally revealed evidence that defendant sought to suppress. Consequently, the motion to suppress should have been granted.