Argued and submitted January 3, 1997; taken En Banc and resubmitted
February 11, reversed and remanded June 24, 1998

STATE OF OREGON,
*Respondent,*

*v.*

VIDYA ANIL PREMSINGH,
aka Anil Mark Premsingh,
*Appellant.*

(C9412-37982; CA A93385)

962 P2d 732

George G. Curtis argued the cause and filed the brief for appellant.

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

ARMSTRONG, J.

De Muniz, J., dissenting.

## ARMSTRONG, J.

Defendant appeals his conviction for possession of a controlled substance. He assigns error to the trial court's denial of his motion to suppress evidence. We reverse.

On November 13, 1994, defendant's sister called the police because defendant was scaring her. Portland Police Officers Woodward and Krantz responded to the call. When the officers arrived, defendant's sister told them that defendant had purchased drugs that evening and had drug paraphernalia in his room. Defendant's mother and sister both told the officers that defendant was "behaving in an abnormal manner, that he was paranoid, agitated, * * * accusatory and nervous." The officers' observations of defendant were consistent with his family's. The officers believed that defendant was on drugs and that his family members feared for their safety. The officers interviewed defendant inside his house while his sister went outside to smoke a cigarette. Woodward testified that defendant was extremely agitated during the interview and that he kept looking out the window at his sister. Near the end of the interview, defendant asked, "Are we done?" When Woodward said "yes," defendant charged toward his sister who was still in the front yard. Woodward decided to stop defendant. She testified:

> "Well, he was charging towards his sister. And because of his behavior and the concerns that had been expressed about his previous paranoid-type behavior towards his sister and his mother, I was concerned that he was perhaps going to have some physical violence towards his sister at that point, so we placed him into custody at that point.
>
> "Q: And were you going to take him down to [jail], or where were you going to take him?
>
> "A: Well, my initial response was simply to get him under control, and we then decided to take him to detox."

Based on that decision, the officers walked defendant to their patrol car to transport him to the detoxification center. Before putting defendant in the car, Krantz patted him down. When asked about the patdown, Woodward testified:

"It was for officer safety. And any time we, for officer-safety purposes, put somebody in the car, we generally pat [the person] down. Also, given the kind of behavior he had been exhibiting, I considered him a threat to my safety, yes."

During the patdown, Krantz felt a long object that he believed could be a weapon. On further investigation, he discovered that it was a "metalish-type filter" with what he suspected was cocaine residue in it. The officers took defendant to jail. He was charged with possession of a controlled substance.

Before trial, defendant moved to suppress the evidence discovered as a result of the search. He argued that the officers did not have authority to take him into custody under ORS 430.399, the civil detoxification statute, because he was not in a public place when they took him into custody. The trial court agreed with defendant. It held, however, that at the time the officers acted, they had authority to stop defendant and pat him down in order to protect themselves from him. It therefore denied defendant's motion to suppress.[1] The court convicted defendant after a trial on stipulated facts.

On appeal, defendant assigns error to the trial court's denial of his motion to suppress. According to the record, the officers took defendant into custody before Krantz patted him down. Krantz performed the patdown because the officers were planning to transport defendant to a detoxification center. Because the patdown was conducted as a result of taking defendant into custody for detoxification, it was permissible only if the officers had lawful custody of defendant. The legality of the patdown depends, therefore, on whether ORS 430.399, the civil detoxification statute, authorized the officers to take defendant into custody.[2] We turn to that issue.

---

[1] The trial court explicitly held that the officers did not have probable cause to arrest defendant for either possession of a controlled substance or attempted assault when they made the stop.

[2] The dissent posits that the patdown can be independently justified under the officer-safety exception to the warrant requirement. We disagree. At the suppression hearing, the prosecutor asked Woodward, "And [Krantz] searched [defendant] pursuant to taking [him] into custody?" She responded, "Yes." On cross-examination, defendant's attorney asked her, "And, Officer, when your partner searched [defendant], that was for officer safety; is that correct?" She responded, "It was for officer safety. And any time we, for officer-safety purposes, put somebody in the

ORS 430.399(1) provides:

> "Any person who is intoxicated or under the influence of controlled substances *in a public place* may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. A person shall be deemed incapacitated when in the opinion of the police officer or director of the treatment facility the person is unable to make a rational decision as to acceptance of assistance."

(Emphasis supplied.) Defendant was in his fenced-in yard on a path leading from his house to the sidewalk when Woodward and Krantz took him into custody. The officers believed that defendant was under the influence of a controlled substance and they decided to take him to a detoxification center. The trial court concluded that ORS 430.399 did not authorize that action because the state had failed to establish that defendant was in a "public place" when the officers took him into custody.

■    On appeal, the state does not dispute that defendant was on private property when the officers took him into custody but argues that that location was still a "public place" as that phrase is used in ORS 430.399. "Public place" is not defined by ORS 430.399. To determine the validity of the state's argument, we must decide what the legislature meant when it used that phrase in the statute. We do that by examining the text of the statute in context, turning to legislative

---

car, we generally pat them down. Also, given the kind of behavior he had been exhibiting, I considered him a threat to my safety, yes." That testimony establishes that the officers conducted the patdown because of a perceived threat that defendant posed while being transported to a detoxification facility. Even if we assume that the concern was valid, the legality of the patdown still depends on the officers' authority to take defendant into custody and transport him, because the perceived need to pat defendant down depends on the officers having custody of him. Hence, the officers' concern for their safety cannot independently justify the patdown.

The state does not challenge on appeal the trial court's conclusion that the officers did not have probable cause to arrest defendant for possession of a controlled substance or for attempted assault. Nor does it argue that any other principle of criminal or civil law authorized the officers to take defendant into custody. Therefore, we consider only whether the officers had authority to take defendant into custody under ORS 430.399.

history only if we cannot discern the meaning of the statute from that review. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Placing ORS 430.399 in its historical context reveals that the legislature intended for "public place" to mean a place that the public is free to enter at will.

Until 1971, public intoxication was a criminal offense. *See former* ORS 166.160, *repealed by* Or Laws 1971, ch 743, § 432. *Former* ORS 166.160 provided:

> "*Any person who enters or is found in a state of intoxication* upon any railway engine, railway car, railway train, aircraft, boat, landing wharf or depot of any common carrier, or on any highway or street, or *in any public place or building, or any person who creates, while in a state of intoxication, any disturbance of the public in any private business or place*, shall be punished upon conviction by a fine of not less than $5 nor more than $100, or by imprisonment in the county jail for a period not exceeding 50 days or both."

(Emphasis supplied.) The statute served two purposes. First, it gave police authority to remove intoxicated people from public places. The mere presence of intoxicated people can be offensive to others. By making it a crime to be intoxicated in a public place, the statute provided the means to remove intoxicated people from places that they and the public otherwise had a right to be. Second, it provided the means to deal with intoxicated people who were in private places but who caused public disturbances. In that light, we conclude that the statute drew a distinction between places that the public could enter at will and those that they could not. The former were public places and the latter were private.

The legislature repealed *former* ORS 166.160 in 1971.[3] At the same time, however, it enacted ORS 430.399[4] and a criminal statute, *former* ORS 166.035, *repealed by* Or Laws 1975, ch 715, § 2.[5] Between those two statutes, the legislature addressed the full range of behavior covered by *former* ORS 166.160, but ended "the longstanding practice of

---

[3] Or Laws 1971, ch 743, § 432.

[4] Or Laws 1971, ch 622, § 7. The civil detoxification statute was renumbered from ORS 426.460 to ORS 430.399 in 1995. For clarity, this opinion refers to the statute as ORS 430.399 throughout.

[5] Or Laws 1971, ch 743, § 221.

dealing with public drunkenness as a criminal offense." *State v. Okeke*, 304 Or 367, 370, 745 P2d 418 (1987). Under the new legislative scheme, *former* ORS 166.035 made it a crime to be intoxicated in public only if the intoxicated person disturbed the public. The statute provided, as relevant, that "[a] person commits the crime of public intoxication if he creates, while in a state of intoxication, any disturbance of the public in any *public or private business or place*." With that change in the criminal code, the police no longer had authority to arrest an intoxicated person who was in a public place if the person was not disturbing the public. However, because public intoxication can be offensive and was considered a health problem, the legislature preserved the authority of the police to deal with publicly intoxicated people under ORS 430.399. Under that statute, instead of arresting a publicly intoxicated person, the police were given discretion to take the person home or to a treatment center. Although the legislature shifted from criminal to civil treatment of publicly intoxicated people who were not disturbing the public, it did so without altering the distinction that it had drawn in *former* ORS 166.160 between public and private places. Hence, the people subject to civil treatment under ORS 430.399 are those who are intoxicated in places that the public can enter at will.[6]

■ The state argues that defendant was in such a place because he was on the path leading from the sidewalk to his house when the police took him into custody. According to the state, that path is the ordinary means by which the public is authorized to approach the residence to contact its occupants, so it is a place that the public is free to enter at will. We disagree. We have held that, unless the occupants of a house "evidence[ ] a desire to exclude casual visitors," approaching a front door to contact the occupants is not a trespass. *State v. Hitesman / Page*, 113 Or App 356, 359, 833 P2d 306, *rev den* 314 Or 574 (1992). The law assumes that people impliedly consent to that conduct, because "social and legal norms of

---

[6] In 1975, the legislature repealed *former* ORS 166.035, *repealed by* Or Laws 1975, ch 715, § 2, but did not amend ORS 430.399 to expand its coverage to intoxicated people who are in a private place from which they can disturb the public. Although the legislature has amended ORS 430.399 several times since its enactment in 1971, none of the amendments affects the meaning of public place under the statute. *See* Or Laws 1973, ch 795, § 3; Or Laws 1979, ch 744, § 22; Or Laws 1981, ch 809, § 1; Or Laws 1985, ch 565, § 68.

behavior" deem approaching a house to contact its occupants to be appropriate behavior. *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995). However, "the intrusion to which * * * occupant[s] impliedly consent[ ] is limited" to allowing a person to take reasonable steps to make contact. *Id*. at 465. Given the limited nature of that consent, it does not confer a right on the public to enter the property at will. We conclude, therefore, that the legislature did not intend to treat the route to the door of a private residence as a public place under the statute.

The state also argues that we should interpret the statute to make a path leading to a private residence a public place because that interpretation would fulfill the purpose of the statute. It asserts:

> "It would make little sense to permit police officers to take an intoxicated and dangerous (or incapacitated) person into protective custody if he is lying on a public sidewalk, but not if he rolls a foot over the property line into his front yard, even though he is lying in the pathway that the general public is free to use to approach his house. Such a person — and defendant in this case—poses just as much a risk of harm to others or himself whether he is intoxicated on one side of the imaginary 'property line' or the other."

That argument is not well taken. Regardless of the legislature's broad social aim when it enacted ORS 430.399, it only authorized the police to take people into custody who are intoxicated in a public place. As a result, even though an intoxicated person in a private place might pose "just as much a risk of harm to others or himself" as a person in a public place,[7] ORS 430.399 only authorizes the police to act when intoxicated people are in public places. We decline the state's invitation to expand the definition of a public place to include the front yard of a private residence if the occupants of the residence have impliedly consented to have people approach the house to contact them. While we appreciate the difficulty faced by police officers who must deal with situations of the kind at issue here on a daily basis, we are not a

---

[7] Indeed, an intoxicated person in a private residence might pose the greatest risk of harm to himself or others precisely because he is out of the public eye. Nevertheless, ORS 430.399(1) does not authorize the police to take such a person into custody.

legislative body and it is not our place to change the meaning of a statute to better achieve our understanding of its purpose.

The dissent does not endorse the state's argument that defendant was in a public place because he was on the path leading to his house. It argues, instead, that our interpretation of the statute leads to an unreasonable result because, under it, "the police would not be authorized to take for treatment a person passed out in a drunken stupor in a front yard when the temperature is minus 20 degrees. Nor would the police be able to take for treatment a person having delirium tremens in a night club restricted to members only." 154 Or App at 695. In order to address those situations, the dissent argues that a public place must be understood to be any place that is either accessible *or* visible to the public. It concludes, as a result, that defendant was in a public place when he was taken into custody because his front yard is visible to the public. The dissent's definition of a public place cannot be sustained in light of the historical context of ORS 430.399.

■ Moreover, it is worth noting that, although the dissent is correct that ORS 430.399 does not authorize the police to take a person into custody in the situations that it describes, the police still would be able to offer assistance in those situations. Under the emergency aid doctrine, an officer can offer emergency assistance to someone, even if that action would otherwise violate Article I, section 9. *See State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den* 317 Or 163 (1993). Furthermore, ORS 133.033 authorizes police officers to perform community caretaking functions. Under that authority, an officer can "enter or remain upon the premises of another if it reasonably appears to be necessary to * * * [r]ender aid to injured or ill persons." ORS 133.033(2)(a)(B). While those provisions do not authorize an officer to take a person who is on private property into "protective custody," they do provide means by which an officer can provide assistance to a person who is ill or in danger as a result of substance abuse.

Neither of those provisions is at issue in this case because the state has not argued that either of them authorized the officers' actions. Here, while on private property, the

officers took defendant into custody and decided to place him in a civil hold under ORS 430.399. They then performed a patdown in order to transport him to the detoxification center. Because the officers did not have authority to take defendant into custody under ORS 430.399, they lacked authority to conduct a patdown based on that authority.[8] The trial court erred, therefore, when it denied defendant's motion to suppress.

Reversed and remanded.

**DE MUNIZ, J.,** dissenting.

The majority accepts defendant's position that the only justification for the patdown here is if defendant was validly in custody for detoxification.[1] The majority holds that he was not because, under the majority's statutory interpretation, defendant's mother's front yard is not a "public place" for purposes of ORS 430.399(1). I would not reach that statutory issue because I conclude that the trial court was correct that the search was justified on the ground of officer safety.

The officers were invited onto the mother's property by defendant's sister, who was frightened by defendant's behavior and had called the police.[2] When the officers arrived, defendant's mother and sister told them that defendant had been acting paranoid and accusatory, was agitated, was following them around and had threatened to kick the bathroom door down when the mother was in the bathroom.

---

[8] The state offers two other reasons why we should conclude that the officers lawfully took defendant into custody under ORS 430.399. First, the state asserts that, "had the police officers not grabbed defendant when they did, he likely would have entered a 'public' area." Although Woodward testified that they took defendant into custody right on the "border" of the property, she also testified that he was "charging" toward his sister. The trial court accepted that testimony. It would make no sense to interpret that evidence now to support an inference that, had the officers not stopped defendant, he would have left the property and then leaned back over the fence to confront his sister, who remained in the yard. Second, the state asserts that defendant's mother owned the property and that she had said that she wanted defendant removed from it. The state did not offer any evidence that the police were acting to comply with that request or that they had the authority to do so. Because neither of the state's assertions is supported by the record, we do not determine the legal significance of either.

[1] The trial court did not find a valid detoxification hold.

[2] Defendant's mother testified that she did not think her daughter was scared, but the trial court found that the mother's testimony was not reliable.

The sister told the officers that defendant's behavior was consistent with past times when he was on drugs, that defendant had "all kinds of drug paraphernalia in his room" and that he had told her that he had bought "crack" that night. While talking with the officers, defendant sat in a rocking chair, rocking so hard that he traveled across the room backwards. He continued rocking even though the chair was hitting against a wall. The officers testified that they believed that defendant was under the influence of intoxicants.

When defendant's sister went outside defendant kept pulling the curtains aside to try to see what she was doing and, when the officers told defendant that their conversation was over, he bolted out the front door, charging toward his sister. The officers intervened. When they put their hands on defendant, "he stiffened up," started to scream, tried to resist putting his hands behind him and resisted being moved to the police car. Officer Woodward testified that the officers "placed [defendant] into custody at that point," that her "initial response was simply to get [defendant] under control, and we then decided to take him to detox." The officers then searched defendant.

The majority concludes that the record establishes that "the officers took defendant into custody before [the officer] patted him down. [The officer] performed the patdown because the officers were planning to transport defendant to a detoxification center." 154 Or App at 686. However, the majority's reading of the record ignores Woodward's testimony that the reason for the search was

> "for officer safety. And any time we, for officer-safety purposes, put somebody in the car, we generally pat them down. Also given the kind of behavior [defendant] had been exhibiting, I considered him a threat to my safety, yes."

An officer may take reasonable steps to protect the officer or others if the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present. *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). It is the totality of the circumstances at the time that must be evaluated to determine whether the

circumstances reasonably appeared to justify taking reasonable precautions. *Id.* at 525. The majority's reading of the record ignores that totality of circumstances and, instead, parses the events into discrete, isolated segments. *See State v. Rickard*, 150 Or App 517, 526, 947 P2d 215, *rev den* 326 Or 234 (1997) (treating factors as discrete and separate would dissolve the totality of the circumstances and ignore the continuing possibility of danger).

Here, the officers had been told of defendant's past drug behavior and his purchase of crack that night and had observed his erratic conduct. The officers had an objective basis for their belief that defendant was under the influence of intoxicants. In that intoxicated condition, defendant had acted in a bizarre and aggressive manner. Defendant charged his sister and resisted and screamed when the officers tried to subdue him. Those circumstances viewed as a whole support the trial court's finding that the officers had reason to fear for their safety. The search was a reasonable precaution under the circumstances, and I would affirm the trial court on that basis.

However, if the majority is correct that the search is valid only if defendant was legally in custody for detoxification, I do not agree that defendant's mother's front yard is not a "public place" for purposes of ORS 430.399(1), the civil detoxification statute. ORS 430.399(1) authorizes the police to take a person to a treatment facility if the person "is intoxicated or under the influence of controlled substances in a public place," but does not define "public place." The majority concludes that "[p]lacing ORS 430.399 in its historical context reveals that the legislature intended for 'public place' to mean a place that the public is free to enter at will." 154 Or App at 688. The starting point for the majority's conclusion is *former* ORS 166.160. Under the majority's interpretation of that statute, the police had the authority to remove intoxicated people from public places, which the majority concludes meant "places that they and the public otherwise had a right to be." The police also had the authority to "deal with intoxicated people who were in private places but who caused public disturbances." 154 Or App at 688. The majority concludes that, in decriminalizing the offense of public drunkenness in 1971, the legislature carried over the distinction in *former*

ORS 166.160 between public and private places when it enacted ORS 430.399 and *former* ORS 166.035. The majority reasons that *former* ORS 166.035 provided for a crime of public intoxication for disturbing the public from any public or private business or place; therefore, "public place" in the civil statute, ORS 430.399, must necessarily be limited to a place where the public has a right to be.

However, the majority's interpretation ignores the legislature's specific treatment of "public place" in the 1971 enactments. At the same time that it enacted *former* ORS 166.160 and ORS 430.399, the legislature enacted ORS 161.015(10). That statute specifically applied to *former* ORS 166.160 and defines "public place" as limited to "a place to which the general public has access." The legislature did *not* make that definition applicable to ORS 430.399. I conclude that the historical context shows that the legislature knew how to limit the definition of "public place" but that it did not do so for purposes of ORS 430.399.

The majority's analysis bypasses the framework of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), under which the starting place in statutory interpretation is the text in context, giving words of common usage their ordinary meaning. "Public" is commonly understood to mean "accessible *or visible* to all members of the community" and includes that which is "exposed to general view." *Webster's Third New International Dictionary,* 1836 (unabridged 1993) (emphasis supplied). Applying the common understanding to "public place" in the text of ORS 430.399 shows that defendant here was in a place "exposed to general view" and, thus, was in a "public place" for purposes of ORS 430.399. There is no need to go further to interpret "public place" in ORS 430.399.

The majority's limitation of police intervention in situations involving intoxicated persons leads to an unreasonable result. Under the majority's interpretation, the police would not be authorized to take for treatment a person passed out in a drunken stupor in a front yard when the temperature is minus 20 degrees. Nor would the police be able to take for treatment a person having delirium tremens in a night club restricted to members only. Although the majority

"appreciates the difficulty" of officers trying to deal with such situations, it concludes that the problem is a legislative one. With all due respect, I suggest that the problem results instead from the majority's erroneous interpretation. I dissent.

Deits, C. J., and Warren and Riggs, JJ., join in this dissent.