Argued and submitted November 19, 1997, reversed and remanded June 24, petition for review denied October 20, 1998 (327 Or 620)

## STATE OF OREGON,
### *Appellant,*

*v.*

## ALAN W. BUSACKER,
### *Respondent.*

## (M25439; CA A95687)

962 P2d 723

Janet A. Klapstein, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

William Lewis argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Defendant was charged with operating a boat while under the influence of intoxicating liquor (BUII), ORS 830.325. The state appeals a trial court order suppressing evidence acquired as the result of an allegedly illegal stop. We reverse and remand.

For the most part, the relevant facts are not disputed. On June 5, 1995, Deputies Lort and Elliott were on river patrol during Rose Parade weekend near downtown Portland. At approximately 10:15 p.m., as they were finishing their patrol and in the process of docking their boat for the night, they received three calls reporting inappropriate activity involving a 35-foot SeaRay cabin cruiser. The first call was from Deputy Matsushima of the Multnomah County Sheriff's office. Elliott spoke directly with Matsushima on a tactical channel and testified as follows to the content of that call:

"[Prosecutor]:  What did [Matsushima] relate to you?

"[Elliott]:  He related that he'd had contact with a vessel that he'd observed in against the seawall between the military vessels that were moored * * * and that they had verbal contact with that vessel and its operator and that they had been unsuccessful in convincing that operator to leave the area and that he suspected that the operator was intoxicated."

Elliott testified that he received two calls shortly thereafter, relayed through dispatch, regarding the same boat. One was from Deputy Lang, Matsushima's partner, who "relayed similar information to the first [call]." The other was from Navy security. Elliott testified with regards to that call as follows:

"[Prosecutor]:  And what was the third call?

"[Elliott]:  The third call was relayed through our dispatch and was from Navy security reporting essentially the same elements - same problem. A vessel that was inside the Navy vessels, between the sea and their mooring and that they were unable to move that vessel away."

Elliott and Lort both testified that they had observed the same boat earlier in the day in the same general area. They testified that they had witnessed drinking and "partying" on the boat but did not specifically recall seeing defendant drinking. On the basis of these calls and their earlier observations, the deputies responded and stopped defendant, leading to his arrest for BUII. In justifying that stop, Elliott testified:

"[Prosecutor]: Can you articulate to the court why you stopped this particular boat?

"[Elliott]: Number of issues come to mind: 1) the number of reports would give greater cause in my mind, not a single report, not two reports, but three reports. Two from uniform officers, one from Navy security and we don't typically get called from Navy security to respond because typically they would often do it themselves. And typically they have a good record with compliance when they make requests. The mere fact that they're asking for help with someone that [they're] not getting results from would give greater weight to the point that I'm going to respond to that. The nature of the call in that the vessel was inside the seawall. * * * It wasn't common for vessels to come inside that wall knowing that they are often and routinely ordered to get back out and that there is a lot of shipboard activity. * * * I had actually seen this vessel earlier and knew that it had been moored, anchored just outside the military vessels, in an appropriate place, for sometime that evening.

"[Prosecutor]: Did you suspect that the person had been drinking when you stopped him?

"[Elliott]: That was a possibility, yes.

"[Prosecutor]: That would be based on the radio calls?

"[Elliott]: Yes."

Lort testified:

"[Prosecutor]: Now, did either of these messages state that there was an intoxicated driver near the sea wall?

"[Lort]: One of the reports stated that the subject appeared to be intoxicated."

Matsushima testified and described the activities he witnessed at the sea wall leading to his summons of Lort and

Elliott. He was on normal patrol in the area of Waterfront Park at approximately 10 p.m. when his attention was drawn to defendant's boat. Matsushima saw sailors yelling at defendant as he maneuvered his boat between Navy vessels, moored there for the Rose Festival, and the sea wall. Matsushima began to yell and motion towards defendant, attempting to get him to remove his boat from the area. He testified that his main concern was that defendant's boat was too close to the Navy ships and was in danger of colliding with them; defendant did not strike any object with his boat. Matsushima saw the boat make "jerky" movements within the confined quarters.[1] Defendant responded to Matsushima's yells and gestures to leave the area by shining his spotlight on the officer. Defendant eventually backed his boat out of the area and departed. The entire incident took about five minutes, and Matsushima observed defendant driving the boat the entire time. He did not see defendant drinking but described defendant's face as "very red."

As defendant was leaving, Matsushima radioed river patrol at the request of the Naval officer in charge of Naval security on the vessel, the U.S.S. John Paul Jones. Matsushima testified repeatedly on direct and cross-examination that he did not recall making an observation that defendant was under the influence of intoxicants. During the suppression hearing, neither the Navy officer nor the sheriff's dispatcher testified.

Defendant moved to suppress all evidence resulting from the stop, asserting that the stop was not justified by reasonable suspicion. In a combined suppression hearing and trial to the court, the court granted defendant's motion. The issue is whether the trial court erred in holding that the stop was not based on reasonable suspicion. The court held:

"I have concluded * * * that it does not amount to reasonable suspicion, and I'm basing that on the totality of the circumstances test articulated in *State v. Mathews*[, 320

---

[1] Defendant argued at the suppression hearing and renews the argument here that what Matsushima observed and described as "jerky" movements were, in nautical terms, "remaining on station." This involves the driver managing the boat's two independent engines, effectively turning the boat within its own length. In keeping station, one engine is often in reverse while the other is forward, resulting in frequent, short movements back and forth.

Or 398, 884 P2d 1224 (1994)]. And that we have here, at most, an observation, that the people were observed on that day drinking at 6 [o'clock], that 4 hours later the defendant's boat was observed in an area that caused some concern to the Navy officers, that Deputy Matsushima observed the defendant's face to be bright red, but that was consistent as well with a sunburn, which seems reasonable to me after being in the sun for 10 hours, and that Deputy Matsushima did not subjectively articulate his personal belief that defendant was under the influence of intoxicants.

"The problem here is that Deputy Elliott and Deputy Lort apparently received some information from some source that suggested that he might be under the influence of intoxicants. But the source himself, Deputy Matsushima, did not recall making that observation about the defendant or coming to that conclusion himself. There is no question that the police are entitled to aggregate, if you will, the observations of all of the police officers, as noted. But the problem here is that Deputy Matsushima, and I reviewed these notes extensively, did not make those observations himself or reach that conclusion himself. Therefore, the officers that are making the stop are not entitled to rely on anything more than Deputy Matsushima himself believed.

"The question then becomes whether they are entitled to rely on some other source, such as the naval officers' observations, and on that note, there's nothing to substantiate the basis for the naval officer's observation, that the defendant was possibly under the influence. * * * The Court of Appeals [has] held that officers need to corroborate, if you will, the anonymous tip. Here, the one person that could corroborate the conduct that was observed was Deputy Matsushima, and he did not corroborate it. * * * The fact that Deputy Matsushima did not have reasonable suspicion to believe that the defendant was under the influence is more persuasive to me than an anonymous tip, arguably from the only other source, to wit, the Navy officers, who were observing the identical conduct.

"* * * * *

"* * * So, for those reasons, I am going to suppress the evidence that flowed from the stop."

On appeal, the state essentially makes three arguments: first, that Matsushima did have reasonable suspicion to believe that defendant was boating under the influence; second, that the collective pool of knowledge, which includes Matsushima, Elliott, Lort, and the unidentified naval officer, amounted to reasonable suspicion; finally, that, at the time of the stop, Elliott and Lort had reasonable suspicion that defendant was boating under the influence. Because the state's final argument is decisive, we address only whether Elliott and Lort reasonably suspected that defendant was boating under the influence at the time of the stop.[2]

■  Although we are bound by the trial court's finding of historical facts that evidence in the record sufficiently supports, we are not bound by the trial court's legal conclusions. *State v. Belt*, 325 Or 6, 14, 932 P2d 1177 (1997).

■  A police officer has authority to stop and question a person if the officer "reasonably suspects" that a crime has been committed. ORS 131.615(1).[3] Reasonable suspicion means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts. ORS 131.605(4). Thus, reasonable suspicion must be based on a subjective belief by the stopping officer that a crime has been committed, and that subjective belief must be objectively "reasonable" under the totality of the circumstances. *See Belt*, 325 Or at 10-11.

■  Defendant does not argue that Lort and Elliott did not have the requisite subjective belief that defendant was

---

[2] The state does not argue on appeal that the stop of defendant's boat was justified by ORS 830.035(1), which provides, in part:

"The sheriff of each county and all other peace officers shall be responsible for the enforcement of this chapter. * * * In the exercise of this responsibility, a peace officer may stop any boat and direct it to a suitable pier or anchorage for boarding."

The state did argue before the trial court that this stop was justified as a routine boat examination and safety inspection but does not pursue that argument on appeal. Additionally, the state did not argue below that ORS 830.305, which prohibits unsafe operation of a boat, or ORS 830.315, which prohibits reckless operation of a boat, justified the stop.

[3] ORS 131.615 provides, in part:

"A peace officer who reasonably suspects that a person has committed * * * a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

boating under the influence.[4] He asserts, however, that under the totality of the circumstances, that belief was not reasonable.

■ To address that issue, we review the testimony at the suppression hearing. Our purpose is to search for "specific and articulable facts that are sufficient as a matter of law to give rise to an inference that a *reasonable* officer would hold the required subjective belief." *Belt*, 325 Or at 12 (emphasis in original).

Lort and Elliott received three calls regarding inappropriate behavior by a boat maneuvering between a Navy vessel and the sea wall. The deputies talked directly to Matsushima but received the other calls from dispatch. The trial court found that they learned of the possibility of intoxication not from Matsushima but from Navy security, relayed to them from dispatch. They had observed the boat earlier in the day and witnessed drinking aboard, although neither could testify that they witnessed defendant drinking. Neither deputy personally witnessed any activity that gave rise to a reasonable suspicion of BUII; the stop was based completely on the reports and their earlier observations. Most important, however, both deputies clearly remember that intoxication was a possibility.

■ Defendant argues, however, that because the trial court found that the question of sobriety was raised by the Navy officer and not Matsushima that that report should be treated as an anonymous informant's tip. When a reasonable suspicion stop is based on an informant's tip, the court must find that that tip is sufficiently reliable to justify the stop. *See State v. Rickard*, 150 Or App 517, 523, 947 P2d 215, *rev den* 326 Or 234 (1997). Defendant argues that this informant's tip was not sufficiently reliable.

■ The question of whether a report by Navy security must be evaluated pursuant to the same standards as that of a citizen informant has not been addressed in this state. However, we need not decide that issue because, even under

---

[4] On the other hand, defendant argues strenuously that Matsushima did not have a subjective belief.

the general test for citizen informant reliability, the test here is satisfied.

■     In addressing whether a stop is justified based on an informant's report, we consider three factors:

> " 'One is whether the informant is exposed to possible criminal and civil prosecution if the report is false. That factor is satisfied if the informant gives his or her name to law enforcement authorities or if the informant delivers the information to the officer in person. The second factor is whether the report is based on the personal observations of the informant. An officer may infer that the information is based on the informant's personal observation if the information contains sufficient detail that
>
>> " ' "it is apparent that the informant had not been fabricating [the] report out of whole cloth * * * [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reliable way * * *." ' *Spinelli v. United States*, 393 US 410, 417-18, 89 S Ct 584, 21 L Ed 2d 637 (1969).
>
> " 'The final factor is whether the officer's own observations corroborated the informant's information. The officer may corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and location substantially as described by the informant.' *State v. Villegas-Varela*, 132 Or App 112, 115, 887 P2d 809 (1994) (citations omitted; brackets in original)." *Rickard*, 150 Or App at 523.

In *Rickard*, the informants did not give their names, but we held that there was no indication that they were unwilling to do so or that they had any reason to lie. *Id*. Additionally, the informants had conveyed the information to the officer in person.

In *State v. Shumway*, 124 Or App 131, 861 P2d 384 (1993), *rev den* 318 Or 459 (1994), the defendant was stopped based on the report of an unnamed citizen informant who had personally approached the arresting officer and reported a drunk driver. The informant described the vehicle and the location of the incident. Subsequently, the officer observed a vehicle matching that description in the identified area and stopped the defendant. The officer did not observe any driving that would indicate intoxication.

In holding that the officer's stop was supported by reasonable suspicion, we found it significant that, although the informant did not identify himself, there was no indication that he was unwilling to do so, he had personally spoken to the officer, and he had no apparent motive to lie. *Id.* at 135. Also, the officer corroborated the informant's report by personally observing the vehicle in the area it was reported. *Id.*

Here, Matsushima reported inappropriate, but not illegal, boating activity. Subsequently, Navy security reported that the same boater was possibly intoxicated. Although not identified, nothing suggests that the Navy officer was not willing to be identified. Because of his position, he was readily identifiable. He had personally approached Matsushima and had also placed a call to dispatch. He based his report on personal observations. Lort and Elliott corroborated those observations when they found defendant and the location of the boat substantially as reported by Matsushima and dispatch. *See State v. Villegas-Varela,* 132 Or App 112, 115, 887 P2d 809 (1994).

Under the totality of circumstances, based on the information known to Lort and Elliott at the time of the stop, their subjective belief that defendant was boating under the influence was objectively reasonable. The trial court erred in suppressing the evidence.

Reversed and remanded.