Argued September 25, affirmed December 26, 1978

## STATE OF OREGON, *Respondent,*
*v.*
## ROBERT PAUL SUPER, *Appellant.*
## (No. C 77-09-12753, CA 10672)
588 P2d 106

S. Randall Johnson, Certified Law Student, Salem, argued the cause for appellant. With him on the brief were Gary D. Babcock, Public Defender, and Marianne Oswald, Deputy Public Defender, Salem.

Gregory A. Parker, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Lee and Richardson, Judges.

LEE, J.

**LEE, J.**

Defendant appeals his conviction of burglary in the second degree on the ground that the trial court erred in denying his motion to suppress evidence seized when officers executed a warrant for his arrest for a separate offense of robbery. Defendant contends that despite the officer's information concerning a possibly dangerous resident of the house entered for the purpose of arrest, the officers violated defendant's Fourth Amendment rights when they entered the basement area to "secure" the premises. We affirm.

The evidence shows that at approximately 7 p.m., Officers Bunnell and Hutchison, acting on a lead, established surveillance of a certain Smith residence in the hope that defendant Super would be seen either entering or leaving it so that they could execute a warrant for his arrest. At approximately 9 p.m. while the officers were driving north on SE 87th they observed a suspect, who resembled the mug shot they had with them, walking south on that street. Before they could get their car turned around the suspect entered the Smith residence. The officers were informed that Smith was a resident of the house and that he was considered violent. (The computer also "flagged" Smith as potentially dangerous and possibly armed.) The officers delayed entry into the residence for approximately six hours until information was relayed to them that defendant was in the house and intended to remain there for the night. They then procured five additional officers and proceeded to the residence to arrest defendant.

To make the arrest, three officers went to the front door, one to a side door, and three, including Bunnell and Hutchison, went to the back. When the officers, at the front door, knocked and identified themselves and their purpose, Bunnell, who was near the back door, observed, through a window, the silhouette of a person moving toward the back door of the house. While forceful entry was being made at the front door,

Bunnell observed a person "slipping" out the back door whom he grabbed and handcuffed. Bunnell testified that he asked that person, "Are you Super; and he did not say anything" so he took him across the street to a police car. As they crossed the street the person admitted that he was Robert Super. Bunnell testified that he was not certain who he had when he handcuffed defendant.

Bunnell then drove the police vehicle across the street, parked in the Smith driveway, went inside the house, and informed the other officers that he had Super in the police car. Approximately five minutes had elapsed since the time that Bunnell left the back porch of the Smith residence.

Meanwhile within the house, a woman on the first floor told the officers that more people were downstairs. Hutchison, in company with another officer, went to the basement where he observed "a large amount of glassware and chemicals" in plain view. He also found Smith and a female juvenile hiding behind some appliances. Hutchison testified that approximately "15 seconds" elapsed between the time that the person at the back door was "secured" and the time that he entered the basement door. By the time that Bunnell returned to the house, Hutchison had returned upstairs with Smith and the juvenile. The entire house was "secured" within approximately two minutes. The search was limited to places in which people could hide.

The glassware which the officers noted in the basement was subsequently identified as the property of Reed College. Defendant was then charged with burglary of those items.[1] At trial, defendant made a motion to suppress the evidence discovered while the officers were in the basement. The motion was denied and he was found guilty.

[1] Defendant was actually charged and found guilty of both burglary in the second degree and theft in the first degree. The court therefore merged the verdicts for purposes of sentencing.

During defendant's closing argument on the motion to suppress, the trial court said:

"* * * I think they had knowledge at that time that he was Super. When they put the handcuffs on him and took him out to the patrol car.

"The question is: Does that at that moment say that is the end. The officers can't secure the premises.

"Here are officers inside these premises; they, according to this record of information, know that some of the occupants of the premises, of the residence, are dangerous, at least one of them besides Super.

"For their own safety, do they have to at that time back out without taking precautions to look in through the rooms and see if there are people there that might be dangerous and leave.

"I don't think they do. I don't think the law requires them to do that.

"I think the law would permit them to, under those circumstances, to secure the premises. That is, to see that there is no one on the premises that would be dangerous to their own safety, so that they can follow through with the arrest and leave the premises in safety."[2]

This is a case of first impression in this state. We agree with the trial court that under these circumstances it was permissible to "secure the premises." We rely on *United States v. Briddle,* 436 F2d 4 (8th Cir 1970), *cert den* 401 US 921 (1971), and its progeny.[3] In

_____

[2]The court's finding that the officers "had knowledge" they had defendant distinguishes this case from *State v. Jordan,* 36 Or App 45, 583 P2d 1161 (1978), in which the officers ordered a "freeze" until they were satisfied that they had properly executed a warrant by arresting the correct person.

[3]*See United States v. Sellers,* 520 F2d 1281, 1284 (4th Cir 1975), *cert den* 429 US 1075; *United States v. Hobson,* 519 F2d 765, 776 (9th Cir 1975), *cert den* 423 US 931 (1975); *United States v. Looney,* 481 F2d 31, 33 (5th Cir 1973), *cert den* 414 US 1070. In *Looney* five federal agents went to defendant's father's house, located in a rural area, at 2:15 in the morning, with a warrant for the arrest of Frick, who was believed to be an occupant of the house. The agents had no arrest warrant for defendant nor a search warrant for the residence. The agents believed Frick to be a very dangerous person and felt that precautionary measures were dictated for their safety

that case, three officers who had a warrant for the arrest of Briddle entered his apartment and observed him standing in the hallway beyond the small living room and near the doors of the two small bedrooms. One of the officers arrested him and the other two " 'fanned out' to make a quick search of the apartment premises to determine whether other persons were present who might prevent Briddle's arrest or detention or present a danger to the officers present in the apartment." After being in the apartment for about one minute, one of the officers entered a bedroom and observed a sawed-off shotgun in plain view on the floor. No other persons were found in the apartment. The sole issue on appeal was the validity of the search and seizure event as it related to the gun. The court affirmed the admission of the gun on the basis that it

---

because of their unfamiliarity with the house, the heinous nature of the crime for which Frick was being arrested, his propensity for using confederates, and the lateness of the hour. Two agents went to the rear of the house and the other three proceeded to the front door. Defendant answered the knock at the front door and after receiving a negative response as to whether Frick was there, entered the house and found Frick hiding behind a bookshelf. After Frick was arrested the agents saw what they believed to be a burned marihuana cigarette on the floor so they arrested Looney and then "cleared" the house thus preventing any possible harm to the agents "by making sure that the agents knew who was in the house." While clearing the house an agent opened a door from a hallway into a bedroom and "saw in plain view" a submachine gun on the floor under the bed. The process of clearing the house "took no more than fifteen minutes from the time of entry." The trial court suppressed evidence of the gun because it was not "within the reach of Frick or Looney" and was out of their immediate control. On appeal the case was reversed and remanded and the court said:

"Upon a careful consideration of the record, we are of the view that neither the revered principles of the Fourth Amendment nor the limitations of *Chimel* are traduced by allowing officers to make a cursory security search to protect their lives under the circumstances here present. The district court dwelt on the fact that the area subject to Frick's and Looney's immediate control was secure. This misses the point. The important thing is that after Frick and Looney were made immobile the agents were instructed to look through the house for *people* that might be in hiding and be a danger to the safety of the agents, and not to look for *things.* Of course, once this security precaution had been taken, any further search without a warrant was prohibited." (Emphasis theirs.) *United States v. Looney, supra,* 481 F2d at 32-33.

was discovered in the course of a "quick and cursory viewing of the apartment area for the presence of other persons who might present a security risk" and that it was in "plain view." The holding in *Briddle* has been followed in the fourth, fifth and ninth circuits. The *Briddle* court distinguished *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969), on which the defendant relied, noting that:

> "* * * In *Chimel,* armed with an arrest warrant, the officers with Chimel's wife were waiting for him to come home. When he arrived home he was arrested under circumstances that did not occasion the officers to conduct a cursory viewing of the house premises concurrently with the arrest as a security measure. Nor is there any indication in *Chimel* that any of the challenged items had been in the plain view of any officer who at the time he saw the item was in a place where he had a right to be as a part of a concededly proper security check of the area where the arrest occurred [footnote omitted]." *United States v. Briddle, supra* 436 F2d at 8.

In the instant case, defendant likewise relies upon *Chimel v. California, supra,* and contends that the intrusion into the basement exceeded necessary police precautions and constituted an unreasonable search. However, *Chimel* is not controlling in the case at bar because the officers were not conducting a routine search—they had reason to believe that another dangerous person was in the house—they were conducting only a cursory search for people rather than an extensive search for evidence.

We hold that when officers have reasonable grounds to believe that a person who poses a security risk is present in a house which they have a right to enter, they may protect themselves by conducting a cursory search of those areas where that person may be hiding and that objects found in plain view, where an officer has the right to be, are admissible.

Affirmed.