Argued and submitted December 16, 1981, resubmitted In Banc May 2,
affirmed July 18, reconsideration denied August 7,
petition for review denied November 27, 1984 (298 Or 329)

# STATE OF OREGON,
*Respondent,*

*v.*

# JAMES C. PEARSON,
*Appellant.*

## (80-10-31; CA A21240)

686 P2d 411

Frank Noonan, Portland, argued the cause for appellant. With him on the brief was Winfree & Noonan, Portland.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

BUTTLER, J.

Warden, J., dissenting.

Warren, J., dissenting.

## BUTTLER, J.

Defendant appeals his conviction under ORS 475.992[1] for possession of a controlled substance. He assigns as error the trial court's denial of his motion to suppress evidence gathered during a search of his residence and the surrounding premises.[2]

During the hearing on defendant's motion to suppress, the state called two principal witnesses, officers Klejmont and Sharp of the Portland Police Bureau, Special Investigation Division, who testified that they had approximately six or seven months' experience in narcotic investigations. Klejmont testified that the investigation of defendant was prompted by information received about September 1, 1980, from a confidential informant.

Sharp testified that the informant had provided substantial information relating to trafficking in narcotics and dangerous drugs, which he or Officer Klejmont checked and found to be accurate; at the direction of Sharp, the informant had purchased controlled substances, which were determined to be what they purported to be after testing; he had, in the past, furnished Sharp or Klejmont with information which had led to the issuance of at least one search warrant leading to the seizure of controlled substances, an arrest and a criminal charge.

Given that kind of relationship with the confidential informant, the officers had good reason to believe that he was reliable[3] at the time he gave them the information involved in this case. The officers, therefore, were entitled to believe what the informant had told them: he had personally observed a

---

[1] ORS 475.992 prohibits the manufacture, delivery and possession of a controlled substance.

[2] Although search and seizure issues are usually raised in the context of the United States Constitution, Amend IV, or Oregon Constitution, Article I, section 9, neither defendant's brief nor the state's directs our attention to either of those constitutional provisions. We, therefore, do not know whether defendant is relying on state or federal constitutional principles.

[3] It should be noted that defendant does not question the reliability of the confidential informant or the reasonableness of the officers' belief that he was reliable. He does question the basis for the informant's knowledge communicated to the officers, and also asserts the staleness of that information.

man whom he knew, Kevin, and Kevin's brother make telephone calls on several occasions to a person named Jim, following which a person named Jim delivered marijuana in large quantities, from 10 to 30 pounds, to Kevin or his brother. The informant had been told, but did not know of his own knowledge, that Jim had 1,000 pounds of marijuana and kept it in an outbuilding on the premises. Kevin had also told him the location of Jim's premises in Sandy and had described them to him; he gave that information to the officers. Although the informant had not been to Jim's premises, he took the officers there using the information he had obtained from Kevin. The premises were as described by the informant, including the existence of guard dogs and an outbuilding. When the informant took the officers to Jim's place, he saw Kevin's brother on the premises, causing the informant to become excited and to duck down in the car in order not to be seen. Subsequently, the officers determined that the premises were owned by defendant and that an automobile in the driveway was registered to him.

During the ensuing two or three weeks, the officers conducted periodic surveillance of the premises for one to three hours at a time, approximately seven times during that period. On the basis of the information obtained from the informant, the officers had a well-founded suspicion that Jim was supplying substantial quantities of marijuana to Kevin and his brother, that Jim was conducting a relatively large scale operation and that Jim lived on the premises described by the informant, who took them there. Surveillance of the premises, however, over the two or three week period did not reveal any suspicious activity until September 24.

On that date, the officers observed six or seven vehicles pull into defendant's driveway, stay for five or ten minutes and then leave. They could not see what was going on until one of the officers, from a lawful vantage point in a tree in defendant's neighbor's yard,[4] observed activity that reasonably appeared to be the transfer of large quantities of marijuana. Klejmont saw defendant and another man, later identified as Chris Burnett, moving rapidly from behind defendant's house, where the barn was located; each was carrying two white plastic garbage bags in each hand. They

---

[4] The officers obtained permission from the neighbor.

moved toward Burnett's automobile and defendant's camper, returned empty-handed and then repeated that process until approximately 20 bags had been moved in that manner. They also heard a whining noise coming from the barn, which sounded to them like a dryer that might be used to dry marijuana for use.

At that point, the officers concluded, we think correctly, that the information they had received from the informant, coupled with their observations, was sufficient to give them probable cause to search the premises. The hearsay information that defendant had 1000 pounds of marijuana on his premises, on which the officers had no basis to rely earlier, attained a ring of veracity when they observed defendant's activities on September 24. Further, even if the information obtained by the officers from the informant, taken by itself, was stale, *see State v. Scheer,* 49 Or App 937, 620 P2d 973 (1980), it was supplemented and updated by the officers' observations on September 24. Sharp made some telephone calls to the Clackamas County sheriff's office requesting assistance and gave them the address and directions on how to get there. After some confusion, explained below, Klejmont and Sharp rendezvoused with a deputy sheriff from Clackamas County, and all three of them entered the property to "freeze the scene" until they could get a warrant.

The question remains whether the circumstances at that time were such that the officers reasonably believed that, if they did not enter the premises promptly, the evidence would be lost. Under all of the circumstances, we conclude that there were exigent circumstances authorizing immediate entry to search for and seize marijuana. Klejmont had just observed defendant and Burnett hurrying back and forth between the barn and the vehicles carrying large plastic bags that he could have reasonably believed contained marijuana, the subject of the investigation. From that observation, he could have reasonably believed that the men were in the process of removing the evidence from the premises. The officers did not know how many persons were on defendant's premises and reasonably considered it advisable to obtain the assistance of additional officers.

When the deputy sheriff responded to Sharp's call for help, he sped by the officers' station near defendant's property

with his overhead lights on in a marked police vehicle. Sharp's vehicle was parked in a neighboring driveway; he jumped in his car and pulled out to give chase to the deputy who had passed by as Klejmont ran to, and jumped into, the car with Sharp. As that occurred, the deputy who had passed them made a quick U-turn and came back to defendant's driveway.

■■ The officers' observations, plus all of the commotion and obvious police presence at that time,[5] reasonably indicated that there was a significant risk that the persons on defendant's premises either already were or would have been alerted to the fact that the police were present and that they would attempt to get rid of the evidence and disappear. Defendant contends that they could have waited outside while they attempted to obtain a search warrant, and if anyone had attempted to drive away they could have stopped him. However, to engage in that kind of second-guessing in a situation that reasonably could have appeared to require immediate action seems inappropriate. Given some of the language in *State v. Hansen,* 295 Or 78, 664 P2d 1095 (1984),[6] it is at least questionable whether keeping the premises under siege from outside the property line would have been preferable from a constitutional standpoint. Accordingly, we conclude that the trial court's conclusion that there were exigent circumstances is supported by the record.

■ Given the existence of probable cause and exigent circumstances, the officers were entitled to enter defendant's

---

[5] Concededly, officers may not create their own exigent circumstances in order to bypass the warrant requirement. *State v. Fondren,* 285 Or 361, 591 P2d 1374 (1979). Here, however, the commotion was not instigated by Sharp and Klejmont, who were the only officers on the scene and were the ones who made the decision that immediate action was necessary. Unless it can be said that Sharp's failure to tell the deputy sheriff to turn off his flashers when he approached the scene was the cause, there is no reason to hold, as the dissenting opinion of Warren, J., would, that the exigent circumstances were created by the responsible officers. In any event, their earlier conclusion that the persons present on defendant's premises might have been alerted to the police presence was reasonable.

[6] In *Hansen,* the court said: "Quite simply, what the police officers did in 'securing' the residence was to seize it in the constitutional sense." 295 Or at 84. There, however, although the officers had probable cause to believe the defendant had committed a crime, there were no exigent circumstances to justify the entry of the defendant's residence. Accordingly, that case holds, the police were trespassers, and when they "secured" the premises they "as effectively reduced the marijuana to the control of the trespassing police as if they had actually discovered and taken physical possession of it. * * *" 295 Or at 97. The marijuana seized pursuant to a subsequently obtained warrant was held to be suppressible.

premises for the purpose of searching for and seizing marijuana. The fact that they stated that their purpose was to "freeze the scene" until they obtained a warrant does not affect the lawfulness of their entry. When they entered the premises, defendant fled and Sharp pursued him unsuccessfully. During the pursuit, he entered the barn, where he observed four plastic bags and some fans. In the meantime, Klejmont apprehended Burnett, who had not attempted to flee. When Sharp returned from his abortive attempt to apprehend defendant, he, Klejmont and Burnett went through defendant's residence to see if other persons were present who might threaten their safety. They saw in plain view a "bong" on the kitchen table.

Following the "protective sweep,"[7] they went outside, advised Burnett of his rights and sought and obtained his permission to search his automobile. They found several bags of marijuana, which Burnett said defendant had told him to put there. Later, other officers arrived and "secured the area," and no further search occurred until a warrant was obtained.

■■■ Given our conclusion that there was a lawful entry by the officers onto defendant's property, their "freezing the scene" does not invalidate their immediate limited search of defendant's premises or the consent search of Burnett's automobile. Because that evidence, without regard to evidence seized pursuant to the warrant, was sufficient to convict defendant of possession of marijuana, it is not necessary to decide what effect, if any, the "freeze of the scene" had on the subsequent search pursuant to the warrant. *See State v. Hansen, supra.* The admission of that evidence, which was cumulative only, was harmless beyond a reasonable doubt. *Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967).

Affirmed.

**WARDEN, J,** dissenting.

Because I disagree with the majority's conclusion "that the information [the officers] had received from the

---

[7] Given our conclusion, it is not necessary to decide the validity of that police action.

informant, coupled with their observation, was sufficient to give them probable cause to search the premises," I dissent.

The warrantless entry and search of defendant's property occurred on September 24, 1981. Warrantless searches are *per se* unreasonable. *See State v. Matsen,* 287 Or 581, 601 P2d 784 (1979). To justify entry onto private property to seize evidence without a warrant, police officers must have both probable cause and exigent circumstances. *State v. Peller,* 287 Or 255, 598 P2d 684 (1979); *State v. Olson,* 287 Or 157, 598 P2d 670 (1979).

Although the trial court found the confidential informant reliable, the police, apparently, did not accept the information as reliable, because they did not seek a search warrant based on it. There are good reasons why they might not. Before issuing a search warrant, a magistrate must make a finding of probable cause. ORS 133.555(2). To support an arrest, " '[p]robable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.005(11). To support a search, probable cause requires a substantial objective basis for believing that there is contraband or evidence of a crime on the premises to be searched. Here, the officers had no such basis for believing that there was marijuana on defendant's property. The informant never claimed to have seen marijuana on defendant's property. His assertion that there was marijuana on the property appears to have been based solely on statements made by an unnamed third party. The record does not reveal the basis for the third party's statements, nor does it indicate that the third party was reliable or was considered by the police to be reliable. In the light of these facts, the informant's assertion that there were 1000 pounds of marijuana on defendant's property around September 1 provides little, if any, support for the conclusion that there was marijuana on defendant's property at that time and even less support for concluding that there were drugs present at the time the intrusion onto the property took place—three weeks or more after the police received the information.

Without the informant's unsubstantiated second-hand report that there was marijuana on defendant's property on or about September 1, there is nothing in this record that

would support a finding of probable cause. Surveillance failed to produce a substantial objective basis for believing that defendant had marijuana on the premises. ORS 131.005(1). The only facts which provide any reason to suppose that there was marijuana present on September 24 are these: on or about September 1, the informant heard orders for marijuana placed by telephone calls to a person called Jim (not an uncommon name), and the informant was present when a person called Jim subsequently delivered the ordered marijuana; the informant was able accurately to describe and then identify the residence property of a person called Jim; and investigation showed that the property was owned by defendant James Pearson.

While those facts implicate a person called Jim in the illegal possession and delivery of a controlled substance sometime around September 1, 1981, and also indicate that the person was almost certainly the defendant, they do not provide sufficient grounds for the officers' conclusion that there were drugs on defendant's property on September 24, 1981. Three weeks or more had passed since "Jim" had been observed delivering marijuana. Nowhere in the record does it appear that the informant identified that "Jim" as the defendant. The surveillance of defendant's property provided no concrete evidence that drug related transactions were taking place there. The fact that guard dogs protected the property, cars came and went, a whirring noise came from the barn and plastic garbage bags were carried from behind the house to the front of the house could at best provide the officers with a suspicion that contraband was present on the premises. A mere suspicion is not sufficient to establish probable cause for a warrantless search. *See State v. McManus,* 267 Or 238, 517 P2d 250 (1973); *State v. Ingram,* 251 Or 324, 445 P2d 503 (1968); *State v. Dunavant,* 250 Or 570, 444 P2d 1 (1968); *State v. Ronniger,* 7 Or App 447, 492 P2d 298 (1971). It follows that the trial court should have granted defendant's motion to suppress.

The only remaining question is whether evidence subsequently obtained from execution of the search warrant should also be suppressed. I believe that it should. On facts close to these, the Supreme Court has said:

"What was the very purpose of the unlawful conduct of the police in this case? It was to arrest and convict defendant for

possession of this primary evidence, this marijuana. How was the unlawful entry to figure in the accomplishment of that purpose? It was to prevent any person from leaving the premises and thereby to ensure that the marijuana believed by the police to be present could not, and would not, be removed. The 'securing' of the premises "has effectively reduced the marijuana to the control of the trespassing police as if they had actually discovered and taken physical possession of it. We hold this to be a seizure under both the state and federal constitutions and thereby proscribed as being unreasonable for want of a warrant." *State v. Hansen,* 295 Or 78, 97, 664 P2d 1095, (1983).

In the instant case, the officers entered upon defendant's property without probable cause to do so. By their "freezing the scene," the marijuana was effectively seized by the police. It follows that the marijuana was unlawfully obtained and, therefore, should not have been used in evidence against the defendant.

Joseph, C.J., and Young, J., join in this dissenting opinion.

**WARREN, J.,** dissenting.

I agree with the majority's analysis of probable cause. Probable cause, however, is not enough to support a warrantless search. Even if the information the officers received from the informant, coupled with their observations, was sufficient to furnish an objective basis for believing that there was evidence of a crime on defendant's premises, the officers were not relieved of their duty to obtain a warrant.

To justify entry onto private property to seize evidence without a warrant, even assuming probable cause, the state carries the burden to show exigent circumstances. *State v. Olson,* 287 Or 157, 598 P2d 670 (1979). The majority finds exigency in the "officers' observations plus all of the commotion and obvious police presence at that time." 69 Or App at 216. That is where we part company. I do not believe that the officers' observations of garbage bags being transported "back and forth *[sic]* between the rear of the house and somewhere towards the [immobile] camper and automobiles at the front of the house" justifies a conclusion that the purported "1000 pounds of marijuana" would disappear during an attempt to secure a valid warrant. The only exigent circumstances were

created by the police officers' Keystone Cops activities. No doubt, after the comical conduct described by Judge Buttler, defendant was aware of the presence of the police and scurried to cover up the evidence of his crime, but officers who choose to act without a warrant cannot create their own exigent circumstances and avoid the need to obtain a warrant by calling defendant's attention to the fact that his criminal activity has been discovered. *State v. Kelgard,* 40 Or App 205, 209, 594 P2d 1271, *rev den* 287 Or 507 (1979); *see also State v. Fondren,* 285 Or 361, 367, 591 P2d 1374 (1979). Although in this case it does not appear that the officers intentionally "blew their cover" as an excuse to avoid the warrant requirement, scenarios can easily be imagined in which that could occur.

The majority's opinion concedes that the officers could have waited outside while attempting to secure a telephone search warrant and, if anyone had attempted to drive out, they could have stopped him. They dismiss this alternative as inappropriate "second-guessing," but I find it to be straight forward compliance with the law. Warrantless searches are *per se* unreasonable. Because I find no exigent circumstances justifying the warrantless search, I dissent. The evidence should be suppressed.