Argued and submitted August 5, 1998, affirmed June 23, 1999

## STATE OF OREGON,
*Respondent,*

*v.*

## JOHN RICHARD COCKE,
*Appellant.*

## (C9604-33280; CA A96903)

984 P2d 321

Diane L. Alessi, Chief Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

WOLLHEIM, J.

Landau, P. J., dissenting.

.

---

* Deits, C. J., *vice* Riggs, P. J., resigned.

**WOLLHEIM, J.**

Defendant appeals his convictions for the manufacture, delivery, and possession of a controlled substance. ORS 475.992; ORS 475.999. He assigns error to the trial court's denial of his motion to suppress. We review for errors of law and affirm.

Portland probation officers called for police back up at a Portland home after discovering one of their probationers, Quaschnick, in the possession of marijuana and an assault-style knife. Quaschnick was found in the living room area of his home with two to three other individuals.[1] All were asked to step out of the house onto the porch. Several minutes later, Officers Goldschmidt and Reyna arrived. Goldschmidt placed Quaschnick under arrest. Quaschnick indicated that, while he shared the common areas of the house, configured as a single family residence, there were separately rented bedrooms for which he could not give consent to search. However, the officers obtained consent from Quaschnick and another occupant, Gilbert, to search their rooms and all common areas. According to a police report, Reyna then accompanied a probation officer inside the house to search the downstairs common area where they found six bags of marijuana and other evidence of possible drug sale activity.

Goldschmidt then accompanied the probation officer inside and, concerned about whether all the residents were out of the house, provided cover for the probation officer to search Quaschnick's room. The probation officer found a large quantity of marijuana packaged for sale but no other weapons. Because the three story house had many rooms and only two to three individuals were removed from the home, Goldschmidt then questioned Quaschnick and Gilbert as to whether anyone remained inside. Gilbert stated no one else was in the house. However, Quaschnick was uncertain if others were present in the house and attempted to explain which individuals lived in which rooms. At that point, Goldschmidt believed that it was necessary to "clear" the house.

---

[1] The arresting officer, Goldschmidt, was uncertain at trial whether there were two or three other individuals discovered in the living room with probationer.

Goldschmidt explained that he concluded that a protective sweep was necessary based on several factors. First, one month before, Goldschmidt had responded to a complaint of a laser sighting coming from the house. In Goldschmidt's experience, such lasers are commonly attached to guns or rifles for accurate shooting. Goldschmidt was also told by his former partner that a month earlier the residents of the house were observed possessing several firearms, including a Glock semi-automatic handgun. Additionally, Goldschmidt's experience was that weapons are commonly found in conjunction with drug sale operations. Thus, his knowledge of firearms at the house one month before and of suspected drug sale activity did not, in his opinion, make for a "safe combination." Goldschmidt's concern was also based on the current discovery of an assault-style weapon on Quaschnick. Finally, Goldschmidt was uncertain whether other individuals remained in the house, where drug and vice officers would be required to remain for 25 to 30 minutes to inventory and process the drugs.

Goldschmidt and Officer Leloff then undertook a "protective sweep" of the house. The house had seven rooms that were rented separately and equipped with dead bolts. The officers checked all the rooms with unlocked doors and any accessible areas where a small person could hide. On the second floor, defendant's door was unlocked and, Goldschmidt testified, ajar. It led to defendant's bedroom on the third floor. The officers entered, encountered defendant, and noticed marijuana and packaging and growing equipment in his room. They arrested defendant, subsequently obtained consent from him to search the room further, and found two rifles in a closet adjacent to his room.

Article I, section 9, of the Oregon Constitution,[2] provides safeguards against unreasonable search and seizure and, hence, protects both privacy and possessory interests.

_____

[2] Article I, section 9, of the Oregon Constitution, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

*State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Defendant argues that the officers conducted an unreasonable search when they entered his room. He agrees that when a police officer is at a lawful vantage point and observes contraband or illegal conduct in "plain view," the officer has not conducted a search in the constitutional sense. *State v. Ainsworth*, 310 Or 613, 617, 801 P2d 749 (1990). However, he argues that the officers were not legitimately in his room when they observed the marijuana. *See State v. Slowikowski*, 307 Or 19, 23, 761 P2d 1315 (1988) (focusing on whether officers were legitimately on premises when marijuana was detected). Thus, defendant argues, his subsequent arrest and consent to search his room were invalid, and the evidence of the drugs and firearms is inadmissible.

The state argues that the officers were properly in defendant's room, where they discovered the contraband in plain view, pursuant to a "protective sweep" of the house for officer safety incident to the arrest of the probationer. *Maryland v. Buie*, 494 US 325, 327, 110 S Ct 1093, 108 L Ed 2d 276 (1990). The trial court agreed with the state, denied the motion to suppress and, on a stipulated facts trial, convicted defendant of the manufacture, delivery, and possession of a controlled substance. ORS 475.992; ORS 475.999.

As a general rule, under Article I, section 9, of the Oregon Constitution, a warrantless search or seizure is *per se* unreasonable unless it falls within one of the limited exceptions to the warrant requirement. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). Oregon's search and seizure law governs when an officer may enter a home, as well as the scope of searches, if any, within the home. "[In the absence of] consent, a warrantless entry can be supported only by exigent circumstances, *i.e.*, where prompt responsive action by police officers is demanded." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). A warrantless search incident to an arrest can be justified to protect the safety of officers and to prevent the destruction of evidence, as well as to reveal evidence of the crime for which the defendant is being arrested, so long as it is reasonable in light of all the facts. *State v. Hoskinson*, 320 Or 83, 86-87, 879 P2d 180 (1994).

■      The reasonableness of searches incident to arrest has been traditionally measured by the search's relation in time, scope, and intensity to the arrest in light of all the circumstances. *State v. Lander,* 137 Or App 222, 226, 903 P2d 903 (1995), *rev den* 323 Or 114 (1996). Thus, even in the officer safety context, we normally determine whether the search was "close both in time and space to the arrest," and whether "the intensity of the search [was] commensurate both with the crime and what was known of the criminal." *State v. Chinn,* 231 Or 259, 273, 373 P2d 392 (1962). The court has limited such searches to areas and items within the immediate control of the arrestee from which the arrestee could obtain a weapon or destroy evidence. *Owens,* 302 Or at 200.

■      The limitation of a search incident to arrest to the area within the immediate control of the arrestee is appropriate when the officer perceives a security risk from the *arrestee.* However, such a limitation is not necessarily appropriate when there is a threat to the safety of an officer from *others* while the officer is making an in-home arrest. We have yet to examine fully what measures are appropriate to protect officers from harm by others in the context of in-home arrests, and it is in this context that the state urges us to adopt the "protective sweep" doctrine announced by the United States Supreme Court in *Buie.* There, the Supreme Court explained that a "protective sweep" is "a quick and limited search of premises, incident to an arrest and * * * narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. Under the Fourth Amendment, such an inspection is warranted when there exists "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. Thus, the *Buie* test provides that, on making an in-home arrest, it is always reasonable for an officer to conduct a cursory search of a house or premises where an officer has a grounded and reasonable suspicion to believe that dangerous persons are present.

Nevertheless, the fact situation in which such a search may occur is narrow. For example, in *Buie,* the officers

possessed an arrest warrant for the defendant and his suspected accomplice in an armed robbery. On entering the home, the officers announced their presence three times and the defendant finally emerged from the basement. Thereafter, an officer entered the basement to ensure that no one else, including the suspected accomplice, remained there. Because of the uncertainty of whether the defendant's accomplice in an armed robbery remained below, the court held that the sweep of the basement was reasonable.

■    In Oregon, it is well established that

> "Article I, section 9 of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates,* 304 Or 519, 524, 747 P2d 991 (1987).

It is equally well-established that, where officers hold a reasonable suspicion to support a criminal investigation, the officers are not permitted, in the absence of probable cause, a warrant, or exigent circumstances, to *enter* one's premises when they perceive danger from the suspect. *Davis,* 295 Or at 242. The Oregon Supreme Court has, however, clearly applied the officer safety principle of *Bates* in evaluating the permissible intrusiveness of both pre- and post-arrest searches.

In *State v. Ehly,* 317 Or 66, 854 P2d 421 (1993), the Oregon Supreme Court held reasonable a prearrest search of the defendant's bag for officer safety reasons where the officers' generalized fears gave way to a particularized fear that the defendant was presently dangerous to them. There, police officers responded to a hotel manager's call for assistance in getting the defendant to vacate the premises. As they arrived, the officers saw a person, Gammond, who was reported to be in the possession of an automatic handgun, leaving the premises. The officers knew that Gammond and the defendant were "running together" at that time and observed that the defendant was under the influence of controlled substances. *Id.* at 80-81. Additionally, the officers

knew that the defendant was a felon and observed him being aggressive toward the hotel manager. The trial court concluded that, in entering the room, the officers were reasonably wary of possible violence. *Id.* at 73. When the officers entered the room, they asked the defendant to leave the premises, but the hotel manager demanded the room key. The defendant voluntarily began searching one of his bags for the key. He placed both hands in the bag and the officers, uncomfortable with the defendant's concealed hands, asked him to dump the contents of the bag. The defendant was unresponsive, so the officers had the defendant move away from the bag. They then searched the contents and discovered a gun.

The Supreme Court concluded that the officers' apprehension on entering the room, combined with the defendant's unresponsiveness and concealed hands, gave the officers reasonable suspicion that the defendant "was reaching for a gun and therefore was presently dangerous to them or other persons present." *Id.* at 82. Importantly, the court rejected the defendant's argument that merely seizing the bag would have sufficiently protected the officers. Rather, it held that the more intrusive *search* of the bag was reasonable because the officers reasonably suspected that a gun was in the bag and that their safety would be at risk if they returned the bag to the defendant unexamined. *Id.* at 83.

Likewise, in *State v. Rickard,* 150 Or App 517, 947 P2d 215, *rev den* 326 Or 234 (1997), we held that a prearrest search of the defendant's pockets was reasonable where the officers were informed by a bystander that an occupant in a car was carrying a gun. The stop of the vehicle was made at night at a busy intersection and the vehicle had several occupants who could possibly be armed. We held that removing the occupants from the vehicle, handcuffing them, and patting them down were not the only reasonable steps the officers could have taken to protect their safety and the safety of the numerous bystanders while the officers searched the vehicle. Rather, we held that "[w]hen the stop is viewed in its entirety," the "need for *all* possible safety precautions was paramount, and the surroundings of the stop demanded a quick response." *Id.* at 527. Therefore, the search of the

defendant's pockets to ensure the safety of all persons present was reasonable.

In contrast, in *Hoskinson* the Oregon Supreme Court concluded that a post-arrest search of the defendant's wallet was unreasonable where the officer testified only that it was his "normal practice" to search the wallets of arrestees. 320 Or at 88. There, the defendant was arrested and handcuffed after the police officer confirmed that the defendant was driving while suspended. The officer conducted a patdown search of the defendant and searched inside defendant's wallet for a weapon or means of escape. The court held that "[i]t is not tenable to suggest that the mere fact that defendant carried a wallet gave the officer reasonable, articulable suspicion that defendant posed a threat of serious physical harm or a threat of escape." *Id.* An officer "may conduct a further protective search if he or she develops a reasonable suspicion, based on specific and articulable facts, that the person in custody poses a serious threat of harm or escape and that a search would lessen or eliminate that threat." *Id.* at 87. However, the court concluded that the search of the wallet "was not reasonable under the circumstances." *Id.* at 88.

The *Bates* principle is based in large part on *Terry v. Ohio*, 392 US 1, 21, 88 S Ct 1868, 20 L Ed 2d 889 (1968), in which the court explained that, under the Fourth Amendment, protective searches are permissible where officers hold a reasonable belief based on "specific and articulable facts" that the suspect is dangerous and could gain immediate control of weapons. *Bates,* 304 Or at 523. The *Terry* rationale also underlies the protective sweep doctrine in *Buie,* 494 US at 333-34. The state urges adoption of the *Buie* rule in searches incident to arrest in homes where others may be present and dangerous, because we have already extended *Bates* into the search incident to arrest exception and because *Bates* shares the same rationale underlying *Buie.* While Oregon cases "interpreting the officer safety exception under Article I, section 9, rely on the United States Supreme Court's interpretation of the Fourth Amendment," *State v. Barnett,* 132 Or App 520, 525, 888 P2d 1064, *rev den* 321 Or 137 (1995), the Oregon Supreme Court has explicitly chosen

to define reasonable searches incident to arrest by relying independently on the Oregon Constitution. *State v. Caraher,* 293 Or 741, 750, 653 P2d 942 (1982). Thus, rather than adopting the *Buie* test, we examine how the application of the *Bates* principle applies in the context of in-home arrests. On the one hand, we recognize that the federal and state constitutional protection against unreasonable searches and seizures was directed primarily to protect one's privacy in their home. *Davis,* 295 Or at 243; *New York v. Harris,* 495 US 14, 18, 110 S Ct 1640, 109 L Ed 2d 13 (1990). On the other hand,

> "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Buie,* 494 US at 333.

While the danger of in-home arrests bears on the protection of one's privacy interests in one's home, the fact of an arrest "does not alone give rise to a unique right to search." *Caraher,* 293 Or at 757.

We do not wish to "uncharitably second-guess an officer's judgment" where an officer "frequently must make life-or-death decisions in a matter of seconds." *Bates,* 304 Or at 524. However, that desire does not require adoption of a *per se* rule that a cursory search is always reasonable. Rather, we see no need to abandon the balance struck by existing Oregon case law where we inquire only "whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 525; *see also Hoskinson,* 320 Or at 90 (Van Hoomissen, concurring) (explaining *Ehly* rejected adopting a *per se* rule that an officer may never search a closed container incident to arrest under officer safety exception once container is outside the arrested person's possession but applied the *Bates* reasonableness test). This case-by-case balancing is consistent with both the search incident to arrest decisions and with the pre-*Buie* decisions dealing with searches of homes incident to arrest.

For example, in *Chinn,* the officers' cursory search of an apartment incident to defendant's arrest was reasonable in scope where the officers entered the apartment and were

told by two occupants that the defendant was not home but would arrive shortly. Required to wait for defendant, who was accused of child molestation, the officers inspected the rooms to make sure

> "that the defendant was not lurking in one of them, and armed, or poised for flight. Further, the officers might have been confronted by intervention by others at any time. In the course of their dangerous duty, police officers are entitled to look to their own security and to make reasonable efforts to check upon the veracity of a suspect's friends or relatives who say he is not at home." 231 Or at 271.

Thus, while the search occurred in the process of making the initial arrest, not subsequent to it, the case, nonetheless, recognizes the importance of officer safety *vis-a-vis* a person's privacy interests in one's home.

Similarly, in *State v. Super,* 37 Or App 731, 737, 588 P2d 106 (1978), we held that, under the Fourth Amendment, "when officers have reasonable grounds to believe that a person who poses a security risk is present in a house which they have a right to enter, they may protect themselves by conducting a cursory search of those areas where that person may be hiding * * *." There, officers held an arrest warrant for the defendant for robbery. On hearing that the defendant was staying with Smith, officers set up surveillance at Smith's house, where they observed the defendant entering the home. The officers were informed that Smith was a resident of the house, was considered dangerous, and was possibly armed. While the officers made a forceful entry at the front, one of the officers apprehended a suspect escaping out the back door, who initially refused to identify himself. The officer then took the suspect across the street to the police vehicle where the suspect then admitted he was the defendant. The officer returned to the house approximately five minutes after first apprehending the defendant and informed the others that the defendant had been taken into custody. Approximately 15 seconds after the defendant was first secured at the back door, the other officers, informed by an occupant of the house that more individuals were downstairs, searched the downstairs and found Smith. The entire house was " 'secured' within approximately two minutes" and searching was limited to places where individuals could hide.

*Id.* at 734. Thus, because the officers were directly informed of other individuals remaining in the house and knew of Smith's possible firearm possession, we held the sweep permissible.

Last, in *State ex rel Juv. Dept. v. Qutub,* 75 Or App 298, 304, 706 P2d 962, *rev den* 300 Or 332 (1985), we held that a cursory search of a defendant's home incident to his arrest to protect the arresting officer's safety was reasonable under the circumstances, including time, place, and intensity. There the officers "had an objectively reasonable belief based on specific, articulable facts that it was dangerous to try to arrest [defendant] and that there were other people hiding in the house whom [defendant] was attempting to warn of the presence of the police." *Id.* at 304. This belief was informed by the officers' attempts to arrest the defendant for one year, the defendant's attempts to conceal his identity, reports that the defendant had vowed *never to return to prison,* an officer's observations at the front door that possibly more than one person was present in the house, an officer's observations of multiple occupants while walking through the house to admit back-up officers into the house, and the defendant's apparent attempts to warn others in the house of the police presence. Additionally, the search was conducted immediately after the defendant's arrest and was intended to dispel any danger that the defendant "was attempting to use others in the house to resist his arrest." *Id.*

■     In sum, Article I, section 9, of the Oregon Constitution, authorizes officers, when making an in-home arrest, to take reasonable steps to protect themselves if the officer has a reasonable suspicion, based on specific and articulable facts, that there could be persons present posing an immediate threat of danger to the officers or others. Such steps can include cursory searches of areas of a home beyond the immediate reach of the arrestee. We focus on the reasonableness of the measures in light of the circumstances as understood by the officers at the time. *Rickard,* 150 Or App at 525-26.

■     While we decline to announce a *per se* rule of reasonableness, we agree that, because of the intrusiveness of a "protective sweep," such searches can be reasonable only under very narrow circumstances that govern both the inception and execution of the search. To identify some of these

factors, we first examine whether an officer presents particularized facts indicating that persons remaining in the house pose an immediate risk of harm to the officers or others. *Bates,* 304 Or at 524. Second, we consider whether the sweep occurred close in time to the perception of the risk of harm and whether it was limited to places where a person could hide. *Ehly,* 317 Or at 71-72 (search of bag immediately after defendant failed to reveal hands as requested); *Qutub,* 75 Or App at 301 (protective sweep conducted immediately after arrest); *Super,* 37 Or App at 734 (reasonable protective sweep commenced approximately 15 seconds after arrest, lasted no longer than two minutes and was a cursory search of areas where persons could hide); *see also Buie,* 494 US at 328 (protective sweep occurred shortly following arrest and was a cursory search of areas where persons could hide). Third, we consider whether the search lasted "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie,* 494 US at 335-36; *see also Rickard,* 150 Or App at 527 (where surroundings of stop demanded a quick response); *Super,* 37 Or App at 734.

We are not here holding that reasonable suspicion is sufficient to justify entry into an apartment that is entirely separate from the premises associated with the arrest. We have consistently held that a separate legal justification is required for that entry and holding otherwise would be at odds with the Oregon Supreme Court's ruling in *Davis,* 295 Or at 242 (holding reasonable suspicion to support criminal investigation does not warrant entry into one's home). It is only where the apartments are configured, as here, to be physically associated with the arrest that reasonable suspicion might support entry. However, we distinguish between a search of a single family home and one of individual apartments within a home because of the heightened privacy interest one holds in one's private quarters. *State v. Louis,* 296 Or 57, 60, 672 P2d 708 (1983). Therefore, we require that the officer hold a particularized and articulable suspicion that the separate apartments could harbor dangerous individuals so as to balance the privacy interest one is entitled to enjoy in one's apartment.

The trial court held that the officers were entitled to be on the premises to assist the probation department. The

officers found evidence from Quaschnick of delivery of a controlled substance, as well as other criminal behavior, on the part of the others in the living room. They found a weapon, the knife. Goldschmidt was reasonably concerned that the call a month before concerning a laser emanating from the house involved a laser scope on a firearm. The court held that the incident was not stale given the "residential nature of the dwelling and the long-term tenancies." The court also found that "based on what [the officers] found, it's clear this was * * * a drug house" and that "firearms are frequently a part of drug houses." The court found that, although not sufficient alone, the officers could consider the fact that the house was in a high-crime, high-drug area, as well as the report that the residents at the house were armed.

Next, the court found that the officers were required to remain inside the house for 25 to 30 minutes and that the officers were uncertain about who else was in the house: "They knew there were seven bedrooms and that they did not have seven tenants there; therefore, there were some unaccounted residents of the house." The officers also knew the bedrooms were not common areas. The court found that the rooms were separate apartments but that the house was still configured as a single family home where access to common areas is part of the design; thus reasonable suspicion of danger was sufficient to warrant entry. The court also held that the officers did hold a reasonable suspicion that the house harbored individuals who posed a threat to their security and that the cursory search of the open rooms was reasonable.

We turn to whether the officers held a reasonable suspicion that other persons were present in the house and could be sufficiently dangerous to the officers to support a protective sweep of the open apartments in the house. We agree with the trial court's conclusion that Goldschmidt held a reasonable suspicion that others could have been present in the house. While Goldschmidt did not see nor hear any others in the house, he was aware that at most four individuals were removed from the house and that the house contained more than four bedrooms. Additionally, Goldschmidt received unclear information from Quaschnick and Gilbert about whether any other occupants were home. These two facts are sufficient to raise a reasonable suspicion that others may

have been present. *See State v. Pearson,* 69 Or App 211, 215, 686 P2d 411, *rev den* 298 Or 239 (1984) (noting that officers' uncertainty regarding number of persons on premises was sufficient, in part, to warrant immediate entry to guard against destruction of evidence).

■■■■ However, the existence of those occupants must also pose an immediate or present threat of danger to the safety of the officers. "Intuition and generalized fear do not give rise to reasonable suspicion of an immediate threat to the safety of the officers or others present at a search." *State v. Reinhardt,* 140 Or App 557, 562, 916 P2d 313 (1996), *rev den* 327 Or 521 (1998). Rather, there must be specific and articulable facts that the persons remaining in the house could present an immediate threat to the officer's safety. *Id.* at 563. We measure the reasonableness of the suspicion by the information the officer understood at the time. *Rickard,* 150 Or App at 525-26. An officer is entitled to weigh his or her professional experience in law enforcement, as well as any personal experience concerning an individual or home, in assessing the security danger to officers or others. *State v. Austin,* 145 Or App 217, 224, 929 P2d 1022 (1996), *rev den* 325 Or 368 (1997). The configuration of the house, other physical circumstances of the arrest and the character of those known to be present are other factors that can be weighed. However, the fact that the house was in a "high-crime" and "high-drug" area is entitled to no weight without some objective evidence that those in the house are engaged in criminal activity. *Bates,* 304 Or at 526.

■■■■ Goldschmidt knew that people in the house were engaged in drug activity and rightly inferred that Quaschnick was a convicted felon. From his experience, he understood that drugs and firearms are not a "real safe combination"—a generalized but rational conclusion. The particular information Goldschmidt held was two reports, each a month old, of possible firearms possession by the *residents* of the house. *See Reinhardt,* 140 Or App at 563-64 (reasonable suspicion may arise where owner of home reported to possess firearms at the house). The officers found a weapon on probationer. Where there was some particular evidence of firearms possession by the residents at the home in conjunction with the current possession of a knife and likely drug sale

activity, the officers were warranted in suspecting some danger of violence.

In order to support a protective sweep of the other apartments, the officers must articulate sufficient facts to support a suspicion that the other apartments could harbor persons who posed an immediate threat of harm. Here, the drugs were found in the common area of a house configured for single family use. Thus, the configuration of the house supported access by the other residents to involvement in the drug activity and, likewise, left the officers vulnerable to attack. Because of the configuration of the home and the location of the drugs, the officers were reasonable in suspecting that the other residents of the home could be involved in the drug activity and, thus, motivated to use force against the police working in that common area. Further, the fact that defendant's door was ajar was evidence to the officers that others remained in the home. When viewed in its entirety, the officers held a reasonable suspicion that the other apartments harbored individuals who posed a danger to their security.

The execution of the search was similarly reasonable. As Goldschmidt testified, the search was a quick and cursory one, intended to ensure the safety of the officers effecting the arrest, as well as of other officers required to remain in the house to inventory the drugs and other evidence. Additionally, the search occurred within a reasonable time after the suspicion of danger arose and before it dissipated. Therefore, the search of defendant's apartment to protect officer safety incident to probationer's arrest was permissible. The trial court properly denied defendant's motion to suppress.

Affirmed.

**LANDAU, P. J.,** dissenting.

A police officer may conduct a warrantless "protective sweep" of an arrestee's premises only on very narrow grounds. Under the federal constitution, when "specific and articulable facts" support an officer's belief that the premises "harbor an individual posing a danger to the officer or others," the officer may conduct

> "a quick and limited search of [the] premises, incident to an arrest * * * narrowly confined to a cursory visual inspection of those places in which a person might be hiding."

*Maryland v. Buie*, 494 US 325, 327, 110 S Ct 1093, 108 L Ed 2d 276 (1990). Under the state constitution, an officer similarly may take

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

The officers in this case arrived at Quaschnick's three-story home, where they found Quaschnick on the front porch with his probation officers and two or three other individuals. Quaschnick had been found in the possession of marijuana and a weapon, both in violation of the conditions of his probation. After placing Quaschnick under arrest, Officer Goldschmidt questioned him about whether others were in the house. Quaschnick did not know.

It was at that point that Goldschmidt decided that it was necessary to search the entire house, before he began what he estimated to be the 25- to 30-minute process of conducting an inventory of the evidence on site. Goldschmidt reasoned—and the majority holds, reasoned correctly—that (1) it was a big house, and others could still be inside; (2) drugs and a knife had been found in the house; (3) one month earlier, Goldschmidt had responded to a complaint about a laser sighting coming from the house; and (4) Goldschmidt had been told that, once again a month earlier, some residents of the house had been observed possessing firearms. Those facts, Goldschmidt later explained, led him to be concerned that other members of the house also could have been involved with the drugs and that those individuals might have a motivation to attack the police.

I do not understand how the foregoing facts—separately or in conjunction with one another—satisfy the prerequisites for a safety-justified warrantless search. At best,

they give rise to a series of speculations: that the house *might have* contained other people, that those people *might have been* the same people who had been seen with weapons a month earlier, that those people *might have been* involved in drugs, and, because of that involvement, they *might have been* motivated to interfere with the processing of the evidence *at some point* during the next half hour. A conjecture that there might be people who might have a motivation to interfere with an investigation some time in the next half hour hardly qualifies as a reasonable suspicion of an "immediate" threat of serious physical injury.

In that regard, the facts of this case recall those in *State v. Reinhardt*, 140 Or App 557, 916 P2d 313 (1996), *rev den* 327 Or 521 (1998). In that case, the police arrived at a suspected drug house, where an informant had reported that, "at some unspecified time in the preceding two months," a man had been observed with "biker-type" people, one of whom carried a weapon. Upon arriving at the house, the police saw the defendant, dressed in a black leather "motorcycle-type" jacket, sporting "extensive tattoos." The police immediately seized the defendant and handcuffed him. They justified the seizure by their safety concerns, reasoning that the defendant *might have been* a member of an outlaw motorcycle gang, who *might have been* among or associated with those who had been seen at the house earlier, who *might have been* involved in drugs at the house, and therefore *might have been* motivated to interfere with the officers' search of the premises. We rejected such reasoning:

> "Intuition and generalized fear do not give rise to reasonable suspicion of an immediate threat to the safety of the officers or others present at the search. * * * Rather, there must be specific and articulable facts to justify the officer's conclusion that a particular person presents an immediate threat of harm."

*Id.* at 562-63. The same reasoning should lead to the same result in this case.

I do not deny the inherent danger involved in effecting an arrest. Nor do I suggest that we uncharitably second-guess the difficult decisions that officers must make in the pressure of the moment. But there are limits to what we may

accept as a safety-based justification for departing from the general rule that searches must be supported by a warrant and probable cause. The majority's decision does not comport with those limits. I therefore respectfully dissent.