Argued and submitted June 23, 2014, affirmed September 30, 2015, petition for review denied April 7, 2016 (359 Or 39)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

EMANUEL CASTILLO-LIMA,
*Defendant-Appellant.*

Washington County Circuit Court
C121988CR; A152978

360 P3d 597

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Defendant was convicted of possession of cocaine, ORS 475.884, and, on appeal from the resulting judgment, contends that the trial court erred in denying his motion to suppress evidence found in a search incident to his arrest. For the reasons set out below, we affirm.

In reviewing a trial court's decision on a suppression motion, we view the record, and all the inferences that it may support, in the light most favorable to the trial court's findings, if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Wolfe, an officer with the Beaverton Police Department, responded to a 1:30 a.m. report of a fight outside of a bar. Seven men were involved in the fight; one was injured and was treated by medical personnel at the scene. Wolfe observed a man in a black and white checkered shirt—later determined to be defendant—leaving the scene. After questioning witnesses, he determined that defendant had been one of the participants in the fight. Wolfe asked another officer to try to locate defendant, but the officer was unable to find him.

At about 3:00 a.m., Wolfe received word that the original participants in the fight had returned to the area of the bar. A witness with whom Wolfe had spoken earlier, Aguilar, was on the sidewalk next to the bar's parking lot, and she told Wolfe that people who had been involved in the fight were in the parking lot of a nearby apartment complex. Wolfe and his police dog went to the area identified by Aguilar but discovered nothing. At that point, Wolfe heard yelling from the area where he had left Aguilar, and he began to return to that area. He saw defendant, whom he recognized from earlier in the evening, and told defendant to "come here." Defendant responded, "I didn't do anything." Wolfe announced that he was a police officer and instructed defendant to get down on the ground. Defendant did not do that but instead asked, "What's going on?" Wolfe, who could still hear yelling from nearby, approached defendant and repeatedly—at least 10 times—told him to get down on the ground. Defendant did not do that, and when Wolfe was approximately 10 feet from defendant, Wolfe told defendant

to get on the ground and that, if he did not comply, Wolfe's police dog would bite him. Defendant then dropped to his knees and raised his arms, at which point Wolfe could see the butt of a gun in defendant's pants. Wolfe pulled defendant to the ground, grabbed the gun and threw it behind them. Wolfe realized after he grabbed the gun that it was a simulated weapon rather than a real weapon.

Wolfe called for backup, and another officer, Volstak, arrived within a few minutes, as did the witness Aguilar. Aguilar indicated that defendant was her husband, that he had been involved in the earlier fight, but that he was not one of the men to whom she had directed Wolfe earlier. Wolfe took defendant into custody, and he and Volstak handcuffed defendant, took him to the police car, and removed everything from his pockets, looking for weapons and means of escape. One of the items found in defendant's pocket was the cocaine at issue in this case.

The issue raised at the suppression hearing was whether Wolfe's emptying of defendant's pockets constituted a lawful search incident to arrest. *See generally State v. Hoskinson*, 320 Or 83, 86, 879 P2d 180 (1994) (search incident to arrest may be justified to protect officer safety, to prevent destruction of evidence, or to discover evidence relevant to crime for which defendant is being arrested). At the time of defendant's arrest, Wolfe had been investigating assault and disorderly conduct crimes; after defendant failed to follow Wolfe's instructions to get onto the ground, Wolfe arrested him for failing to obey a lawful order. Defendant asserts, and the state does not dispute, that the search incident to arrest in this case was not to discover evidence of the crime for which Wolfe had arrested defendant or to prevent destruction of evidence. Rather, the sole question is whether the scope of the search incident to arrest was justified by legitimate officer-safety concerns.

Defendant does not assert that Wolfe's initial seizure of the gun at defendant's waist was unlawful; the evidence is undisputed that, at the time that Wolfe seized the gun, he believed it to be an actual and not a simulated weapon. Rather, defendant argues that removing items from his pockets after the weapon was determined to be fake was

unlawful because, at that point, Wolfe no longer had a reasonable belief that defendant possessed weapons.

In light of defendant's argument, we recount Wolfe's testimony about the concerns that led to his actions after he had thrown the fake gun aside:

"[WOLFE:]  [Defendant] was involved in the fight.

"Q:  Okay, What do you do then?

"A:  I went back with Officer Volstak and the Defendant, we got him up off the ground and walked him over to a police car, at which point we removed everything from his pockets looking for other weapons and * * * means of escape.

"Q:  All right. So if you would, just elaborate a little bit as to why you felt you needed to look for weapons on his person.

"A:  I'd already found one simulated weapon. Oftentimes when I find one weapon, people normally carry other weapons, knives, and other means of self-defense, or offensive weapons. So I was checking to make sure he wasn't going to have anything else on him that was going to injure us while we were in such close proximity talking to him."

When asked subsequently by the court about the sequence of events, Wolfe added:

"The—it was a very quick and fluid—Ms. Aguilar had pointed me to the back of that [apartment] complex, telling me that 'they' were over there, so in my mind there was more than one person in this dark parking lot. I confront the Defendant, who's not obeying what I'm doing, I still don't know if someone else is coming up behind me, that's why it was so quick and so fast. And he needed to do what I told him to do as quickly as—as he could, because I didn't know who else was out and around.

"Again, I had been directed to that part of the parking lot for multiple suspects, and I—and I only saw one being— one person there, being the Defendant. So I had my—my safety concerns in mind."

In denying the suppression motion, the court first ruled that Wolfe had probable cause to arrest defendant—a conclusion that is not challenged on appeal. With respect to the officer-safety issue, the court ruled:

"[R]ight before [Wolfe] pushed [defendant] down, he saw he had this gun. And of course, his first thought is as a police officer out there, confronting a guy in that circumstance, questioning the officer's authority and what's going on, and all that kind of stuff, and then he sees a gun on his person, you can imagine what was going through his head. And the only option he had was to grab it and throw it away, and he did that. And it was fake, and he realized—and he said on the witness stand it was a toy gun, or whatever.

"But the officer's security is heightened at that point. You have a fight, there [were] seven people, I think he said they were Hispanics. He's [sic] there's no evidence or facts saying this was gang related, or anything like that, but you could imagine the officer's—what's going on in his mind about what he's got himself into now. So he's real—his tension, if you will, or his concern for his security is certainly heightened because of this fake gun, he's not sure what he's got going on at that point. And so he's concerned for his safety and security, and he's arrested him, there's no question that he was arrested.

"\* \* \* \* \*

"The only other issue \* \* \* that I haven't really thoroughly covered, I thought it was the issue with regard to taking the stuff out of his pockets. And that was a search incident to an arrest. \* \* \*

"\* \* \* \* \*

"Okay. So the pocket search by the officer has to be based on his—that is, going into his pockets and pulling all that stuff out, has to be based on his concern for his safety, and it has to be—as I said earlier, has to be reasonable in terms of time and place and intensity. And certainly, given our facts and the officer—like I was saying earlier, the officers having pulled—what he thought initially was a real gun; it turned out to be a play gun—or toy gun, doesn't necessarily diminish his concern for his safety. \* \* \* [T]hat's not unreasonably intrusive given the—what had occurred earlier."

The court therefore denied defendant's suppression motion. Defendant was convicted after a stipulated-facts trial.

On appeal, defendant argues that, although a brief patdown of an arrestee is always permitted incident to an

arrest, a more extensive search, such as the search of an arrestee's pockets, must be based on specific and articulable facts "that the person in custody poses a serious threat of harm or escape and that a search would lessen or eliminate that threat." *Hoskinson*, 320 Or at 87.

Article I, section 9, of the Oregon Constitution prohibits unreasonable searches and seizures.[1] Under that provision, warrantless searches are *per se* unreasonable unless they fall within one of the established exceptions to the warrant requirement. *See, e.g., State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (so stating). The parties appear to agree that the relevant exception in this case is the officer-safety exception. Therefore, the inquiry on appeal is "whether the precautions taken were reasonable under the circumstances as they appeared at the time that the decision was made." *State v. Bates*, 304 Or 519, 525, 747 P2d 991 (1987). Moreover, it is not the court's function

> "to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations."

*Id.* at 524.

As a general rule, an officer may conduct a patdown of a person under the officer-safety exception if the officer has a reasonable basis to believe that the person poses a threat to the officer's safety. In *State v. Rudder*, 347 Or 14, 217 P3d 1064 (2009), for example, an officer was dispatched to investigate a possible burglary. As the officer approached the location of the possible break in, he noticed the defendant walking away. The officer stopped the defendant, who appeared nervous and had several bulges in the front pockets of his pants. The officer asked the defendant for consent to search his pockets. The defendant refused. At that point, another officer arrived and told the defendant to put his

---

[1] Article I, section 9, provides, in relevant part:

"No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure * * *."

hands up and away from his body, which the defendant did. One of the officers tried to perform a patdown of the defendant's pockets, but the defendant turned away each time the officer tried to do that. At that point, the officers handcuffed the defendant, pulled one of his pant pockets open, looked in it, and found drugs. The defendant was convicted of drug possession and appealed, contending that the officers' search of his pocket was unlawful. The Supreme Court agreed, reasoning that a

"patdown, because of its limited intrusiveness, is constitutionally permissible if it is based on a reasonable suspicion of a threat to officer safety. But intrusion *into* a suspect's clothing requires something more—either probable cause or some greater justification than was present here."

*Id.* at 25 (emphasis in original).

To determine whether there was "something more" that would justify an intrusion greater than a patdown, we consider both the nature and the extent of the perceived danger and the degree of intrusion or restraint resulting from the officer's conduct. *See, e.g., State v. Rickard*, 150 Or App 517, 947 P2d 215 (1997). In *Rickard*, an officer stopped her car at a red light on a busy street while on routine patrol. People began to yell excitedly that a person in the car in front of the officer had a gun. The officer turned on her overhead lights, drew her gun, and confronted the occupants of the car. Other police officers quickly arrived. Concerned that there might be an armed person in the car whom they could not see, the officers instructed the people in the car to step out of the car one person at a time. After leaving the car, each person was taken to a custody team. The custody team handcuffed the person, searched all of the person's pockets, and placed the person in a police car. The state presented evidence at trial that the police officers took those steps because they wanted to "make sure [that the people who had just left the car] didn't have any weapons or articles of escape because they're going to be * * * behind us during the rest of this high-risk stop." *Id.* at 520.

The officers found marijuana when they searched the defendant's pockets after he stepped out of the car, which led to the defendant's conviction for drug possession.

On appeal, the defendant contended that the officers should have limited their search of him to a patdown. We disagreed, emphasizing the substantial deference that we are to grant an officer's understanding of the situation:

"'[R]easonableness' under *Bates* necessarily requires consideration both of the nature and extent of the perceived danger and of the degree of intrusion or restraint resulting from the officer's conduct, keeping in mind that we are not to 'uncharitably second-guess' the split-second decisions of officers working under dangerous, potentially deadly, circumstances."

*Id*. at 526 (quoting *Bates*, 304 Or at 524). We concluded that, given the totality of the circumstances, the officer's conduct was justified.

The dissent in *Rickard* conceded that the officer-safety exception justified placing the defendant in handcuffs. It asserted, however, that, once the defendant was in handcuffs, "the danger had been substantially mitigated" and, consequently, the search of the defendant's pockets was no longer justified by the officer-safety exception. *Id*. at 529. We disagreed, stating that we knew "of no authority that suggests that, if a risk of danger is 'substantially mitigated,' officers are precluded from trying to completely eliminate any risk." *Id*. at 526. We concluded that the officers acted reasonably in taking further precautions because "[h]and-cuffing did not remove all possibility of danger." *Id*. at 527.

Here, it is not seriously disputed that significant and legitimate officer-safety concerns were present soon after Wolfe and his police dog responded to the 3:00 a.m. report. We reiterate the crucial facts: Wolfe responded to a report that the participants in an earlier bar fight involving seven people—which had resulted in injuries to one of them—had returned to the area of the fight. On his arrival, Wolfe was directed to a dark parking lot next to an apartment complex and near the bar where the fight had occurred. A witness told Wolfe that "they"—the people who had been involved in the fight—were in the apartment complex parking lot. Near that area, he encountered defendant, whom Wolfe had earlier seen in the area of the fight and had identified as one of the participants. On encountering defendant, Wolfe

ordered him to the ground, and defendant failed to respond to numerous directives that he drop to the ground and did not do so until threatened with the dog. Wolfe saw what appeared to be a gun and seized it, but realized that it was a fake gun. While that was occurring, Wolfe could hear yelling nearby but could not discern what was happening. He remained concerned that other suspects were nearby and, possibly, behind him.

In support of his argument that any officer-safety concerns should have dissipated at that point, defendant notes that Wolfe had already determined that the seized weapon was not real; that a backup officer, Volstak, had arrived and defendant had been handcuffed; and that Wolfe had no specific knowledge that any weapon had been used in the earlier assault outside the bar or that defendant had been the one who had injured the assault victim. While we agree with defendant that, to a certain extent, the arrival of a backup officer and the handcuffing of defendant reduced the initial officer-safety concerns, we do not agree that the concerns had so dissipated that it was unreasonable for the officers to search defendant's pockets for a weapon or means of escape.

In that respect, this case is more like *Rickard* than *Rudder*. In *Rickard*, the officers stated that they had searched the defendant's pockets because they wanted to "make sure [the people who had just left the car] didn't have any weapons or articles of escape because they're going to be * * * behind us during the rest of this high-risk stop." 150 Or App at 520. Wolfe likewise searched defendant's pockets because he believed that the group of people involved in the assault might come up behind him, jeopardizing his and Volstak's safety. In other words, both this case and *Rickard* involved heightened officer-safety measures because the officers needed to focus all of their attention on other officer-safety threats and could not risk defendant escaping with a weapon while their attention was focused on the other threats. In light of those threats, it was reasonable for the officers to ensure before securing defendant in a police car that he did not have weapons or things that might help him escape.

In contrast, the defendant in *Rudder* was walking home alone, there were no other threats to officer safety, and there was no evidence that the defendant had a gun or had been involved in an assault. Furthermore, the defendant immediately complied with the officers' demand that he place his hands away from his body.

In summary, an officer may conduct a patdown of a person under the officer-safety exception if the officer has a reasonable basis to believe that the person poses a threat to the officer's safety. However, an intrusion into a person's clothes requires something more. There was something more here: Wolfe was in a highly charged situation, having just confronted an uncooperative suspect who appeared to be armed. One backup officer had arrived, but Wolfe had reason to believe that others who had been involved in a violent assault were nearby. As noted in *Bates*, officers "must be allowed considerable latitude to take safety precautions" in situations fraught with such tension and uncertainty. 304 Or at 524. In light of that standard, defendant's uncooperative behavior, and the existence of other officer-safety threats, we conclude that the precaution of emptying defendant's pockets to check for weapons or means of escape constituted a reasonable officer-safety measure.

Affirmed.